**LIFE INSURANCE COMPANY OF GEORGIA, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 744-85 T.

United States Claims Court.

Feb. 28, 1989.

Ralph B. Levy, King and Spalding, Atlanta, Ga., atty. of record for plaintiff. Peter J. Genz, of counsel.

Michael J. Dennis, Washington, D.C., with whom was Asst. Atty. Gen. William S. Rose, Jr., for defendant.

## OPINION

WIESE, Judge.

Under the Life Insurance Company Income Tax Act of 1959, Pub.L. No. 86–69, 73 Stat. 115, which amended sections 801–820 of the Internal Revenue Code of 1954, life

insurance companies enjoy a deferral of federal income taxes on one-half of the amount by which their gain from operations (meaning, essentially, the income deriving both from risk underwriting and investment activities less allowable deductions) exceeds their gain from investment activities alone (*i.e.*, investment income less allowable deductions). 26 U.S.C. § 802(b) (1982). Given this taxing scheme, expenses that can be charged against investment income rather than underwriting income yield a larger tax benefit: they reduce taxable income by the full amount of the deduction being claimed rather than by only one-half. It is this more favorable tax result which prompts the issue now before us on cross-motions for partial summary judgment.

The problem at hand involves a dispute over the amount of contributions to an employee profit sharing and retirement plan which may be claimed as a deduction against investment income. Plaintiff contends that the amount is to be fixed according to the income sources contributing to the profit and, hence, according to the ratio between the earnings of the investment and insurance departments; defendant's position is that it is the relative size of the employee payrolls in these two departments which prescribes the pertinent ratio. Argument on the question was heard on February 1, 1989; we decide in defendant's favor.

## FACTS

Plaintiff, Life Insurance Company of Georgia (also herein "the company"), is a life insurance company incorporated under the laws of Georgia. During the years in issue (1977 through 1980), plaintiff maintained a profit sharing and retirement plan for its investment department and underwriting department employees. The purpose of the plan was to provide these employees with additional compensation. To be eligible for participation in the plan, an employee was required to have had three years of service with the company and have attained twenty-five years of age, or, if younger, then five years of service with the company.

Under the plan, plaintiff was required to contribute seven percent of its annual profit[1] as reported in plaintiff's National Association of Insurance Commissioners ("NAIC") annual statement. The NAIC annual statement is filed in accordance with rules promulgated by a national organization of state regulatory officials and is used by plaintiff for financial reporting purposes. The assets of the plan consisted of plaintiff's contributions coupled with earnings on plan investments; the amount of each employee's share was generally based on a percentage of the employee's compensation for the year. During the years at issue, plaintiff's annual contributions to the plan ranged from approximately 1.7 million dollars to roughly 2.3 million dollars.

For NAIC annual statement purposes, plaintiff was required to report the amounts of its annual contributions applied to its investment and insurance departments. However, because some employees performed duties for both departments, plaintiff was unable to determine the precise amount to be allocated to each department. Therefore, as a substitute means of measurement, plaintiff used the ratio of current compensation paid to participating employees of the investment department to current compensation paid to all plan participants. Using this salary-based method of allocation, approximately three percent of the annual contributions made during the years in issue was allocated to the investment department for NAIC reporting purposes.

For federal income tax purposes, however, plaintiff did not follow this salary-based allocation formula. Rather, in determining the amount of plan contributions that were to be treated, on the one hand, as investment expenses (deductible in the computation of taxable investment income un-

---

1. "Profit" was defined in the plan as statutory net gain from operations after dividends to policy holders and before income taxes and profit-sharing contributions, excluding capital gain and losses.

der section 804(c)(1)) and, on the other hand, as underwriting expenses (deductible in the computation of gain or loss from operations under section 809(a)), plaintiff relied on the ratio of investment department income to total net income. By this method of allocation, from 98.11 to 100 percent of total plan contributions were charged as expenses against investment income.[2]

On audit, the Commissioner of Internal Revenue rejected plaintiff's tax allocation of the plan contributions. Instead, the Commissioner, consistent with the treatment of the item for NAIC annual statement purposes, made an allocation based on the relative amounts of salaries and commissions paid by plaintiff's investment and insurance departments. Based on this and other adjustments, the Commissioner determined deficiencies against plaintiff. Plaintiff paid the claimed deficiencies and then instituted this suit for their refund.

## DISCUSSION

We start with what is not debated. It is agreed that because plaintiff's contributions to the plan benefited more than one department of the company—payments went to employees of both the underwriting and investment branches—they are to be regarded as "general expenses" within the meaning of IRC § 804—the tax code section which defines taxable investment income of life insurance companies. It is also agreed that, under the standards defined by case law, a general expense is deductible against investment income only when that expense bears some direct relationship to the investment department and is reasonably susceptible to division and allocation between the benefiting departments. Among the cases on point is *Ohio National Life Insurance Co. v. United States*, 11 Cl.Ct. 477, *aff'd per curiam*, 807 F.2d 1577 (Fed.Cir.1986) which explains

that the deduction of general expenses under § 804(c)(1) is confined

to those general expenses that bear a *causal* connection with investment income, i.e., those particular costs which, though pooled under the heading of a general expense, owe their existence entirely to the activities of the investment department. Under this standard, any portion of a general expense that is identifiable with a corporate resource (financial, physical, or human) that assists in or is utilized in the immediate activity of producing investment income would qualify for deduction. 11 Cl.Ct. at 480 (emphasis in original).

Both sides recognize the applicability of the foregoing rule to the problem raised in this case and both claim that the accounting treatment they are espousing is in harmony with that rule. Their arguments follow.

To state first the Government's side of the issue, the contention is that plaintiff's contributions to the profit sharing plan represent payments of additional compensation to the company's employees and thus only that portion of the total payments which go to employees of the investment department can fairly be claimed as an expense of that department. In essence, the argument is that expenses are deductible against the activity which generated them.

Plaintiff has a different view. Plaintiff concedes that a compensation-directed allocation formula has merit in those instances where the employer's obligation to contribute to an employee benefit plan is fixed and not tied to profits. But, says plaintiff, that approach offers a far less satisfactory rationale where the aggregate amount of expense being allocated is causally independent of the activity to which it is being attributed. In a case such as this—the

---

2. During the years in issue, plaintiff's method of allocating plan contributions for income tax purposes resulted in dividing those contributions between investment expenses and underwriting expenses as follows:

| Tax Year | Investment Expense | Underwriting Expense |
|---|---|---|
| 1977 | $1,685,260 | $32,465 |
| 1978 | 1,945,298 | –0– |
| 1979 | 2,305,917 | –0– |
| 1980 | 2,370,832 | –0– |
| TOTAL | $8,307,307 | $32,465 |

argument continues—where the aggregate amount of the contribution is tied to the amount of profits earned (there being no obligation for any distribution absent the existence of a profit) it makes better sense to treat the contributions as costs inherent in the two profit streams (investment and underwriting) out of which they emerge. In essence, the rationale is that the occasion of a profit is, simultaneously, the occasion of a cost.

■ Though plaintiff's position seems attractive on its face, the dictates of sound accounting practice argue against its acceptance. One of the fundamental aims of an accounting system is to accumulate and record costs of doing business in a manner that fairly reflects the economic sense of the underlying events. J. Neuner & E. Deakin III, *Cost Accounting Principles and Practice* 4 (9th ed. 1977). To this end, a guiding principle in the allocation of costs is the relationship of "cause and effect"— the identification of costs with the activities that produced them. C. Horngren, *Cost Accounting: A Managerial Emphasis* 21 n. 1, 477 (5th ed. 1982). In accounting parlance, the term "cost objective" is used to describe the umbrella under which pertinent costs are gathered.

Whether costs are incurred to benefit a single cost objective, or, as here, for the benefit of more than one activity, the basis for allocation remains the same: to the extent it is economically feasible to do so, costs should be distributed pursuant to the causal relationship between the resource consumed and the benefiting objective. Cost Accounting Standard 418—Allocation of Direct and Indirect Costs, 4 CFR § 418.50(e) (1988). Nor does it make any difference that the concern in this case is with a distribution out of profits rather than with an expense incurred before the existence of a profit has been determined. In either case, an expenditure undertaken in payment for services performed is a cost of doing business and therefore should be allocated to the benefiting departments in accordance with their respective payrolls.

The authorities plaintiff relies on do not argue for a different result. Reference is made to such cases as *Liberty Life Insurance Co. v. United States,* 594 F.2d 21 (4th Cir.), *cert. denied,* 444 U.S. 838, 100 S.Ct. 74, 62 L.Ed.2d 49 (1979), *Northwestern Mutual Life Insurance Co. v. United States,* 7 Cl.Ct. 501 (1985), *aff'd* 795 F.2d 74 (Fed.Cir.1986) and *Ohio National Life Insurance Co. v. United States,* 11 Cl.Ct. 477, (1986), *aff'd,* 807 F.2d 1577 (Fed.Cir. 1986) in which the question at issue involved, respectively, the allocability to investment income of state license fees, state income taxes, and, agents' sales commissions.

Leaving specifics aside, what these cases say in essence is that an expense may be claimed against investment income when it is seen to have a direct connection with that income. Plaintiff characterizes the result differently. According to plaintiff, these cases affirm the view that expenses are to be classified on the basis of the source of the income out of which they arose. Plaintiff puts it this way: "the expense [referring, in this instance, to agents' sales commissions] is the immediate occasion, or the result of, the receipt of income by the insurance company"; hence, the expense is to be charged against the income source out of which it was satisfied.

■ We cannot go along with this treatment of the issue. It is incorrect to view an expense as "the immediate occasion, or the result of, the receipt of income." Properly understood, an expense is the result of *activities* that produce income or, in the case of a tax, of an assessment against that income. Thus, for an allocation scheme to make economic sense, it must link expenses and income according to the causal relationship between the two. A tax on income, for example, is not caused by the existence of income; rather it is caused by the statute which authorizes the imposition of the tax. The guiding discipline, in other words, is one in which the "why" of the expense is the essential determinant of its allocation.[3]

3. A comprehensive discussion of cost assess-

ment appears in J. Demski and G. Feltham, *Cost*

Plaintiff's allocation scheme fails this test: it assigns the expense of the profit-sharing contributions to investment income without any cause-and-effect justification for such an allocation. Consequently, there is no economic validity to the approach taken; the result it yields is arbitrary and, therefore, unacceptable.

As a final note, we add that the views we have stated here are not ours alone. Essentially the same reasoning and result are reflected in *Liberty National Life Insurance Co. v. United States*, 816 F.2d 1520 (11th Cir.1987). There the court said:

> Because Liberty National's profit-sharing expenses are compensation, the expenses must be allocated in the same manner as is any other compensation deduction—based on the type of work performed by the employees receiving the compensation.

## CONCLUSION

Based on the reasons given, defendant's motion for partial summary judgment is granted.

*Determination: A Conceptual Approach* (1st ed. 1976). Regarding cost objects, this work explains:

> The objects to which costs are assigned have three important dimensions: type, time, and quantity. In general, the object may be of any conceivable type: a product, an action, dimensions: type, time, and quantity. In general, the object may be of any conceivable type: a product, an action, a storm, a production schedule, a conviction, a child, a service center, or an invoice. However, ... the objects must, if cost assessment is to promote decision making, reflect or relate to the action alternatives being evaluated. We often casually suppress this relationship, as when we speak of the cost of a product as opposed to the cost of the actions that produced that product. And the relationship is often oblique, as when we speak of personnel training costs. But the action orientation remains fundamental. *Id.* at 62–63.