**TRAVELERS INSURANCE COMPANY, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**Nos. 494–88T, 262–89T.**

United States Court of Federal Claims.

April 30, 1993.

E. Victor Willetts, Jr., Washington, DC, with whom was Peter H. Winslow, and Biruta P. Kelly, for plaintiff.

Stuart J. Bassin, Washington, DC, with whom was David Gustafson, Asst. Chief, Mildred L. Seidman, Chief, Claims Court Section, Tax Div., U.S. Dept. of Justice, and Shirley D. Peterson, Asst. Atty. Gen., for defendant.

## OPINION

SMITH, Chief Judge.

These consolidated cases, involving claims for refund of $9,965,157.00 in income taxes and interest for the tax years 1975 through 1980, are before the court on the parties' cross-motions for partial summary judgment. The pending motions involve the determination of plaintiff's foreign source taxable income for purposes of its allowable credit for taxes paid to the government of Indonesia for the years 1975 through 1980. Plaintiff contends that defendant improperly computed its foreign investment income by reference to the life insurance company income tax provisions of the Internal Revenue Code. The government maintains that its method of com-

putation of plaintiff's foreign investment income was correct, except for two years in which defendant claims it erred in plaintiff's favor. Thus, the government claims it is entitled to an offset for those years. After careful consideration of the parties' briefs, oral arguments, supporting documentation, the highly complex statutory scheme, and the applicable precedent, the court concludes that plaintiff must prevail.

## FACTS

Plaintiff, the Travelers Insurance Company (Travelers)[1], is a stock corporation organized and existing under the laws of the state of Connecticut. Travelers is engaged in the business of writing various forms of life and accident insurance. Therefore, during the tax years in question, plaintiff was taxed under the provisions of Subchapter L, Part 1, Section 801 *et seq.*, of the Internal Revenue Code of 1954 (IRC).[2]

In 1970, as part of its investment activities, plaintiff entered into an agreement with the Reading & Bates Offshore Drilling Company (R & B), whereby R & B assigned 75 percent of its 4 percent interest in an Indonesian oil exploration and drilling joint venture to Travelers. Under the agreement, Travelers provided 75 percent of R & B's required contribution in the joint venture and received 75 percent of R & B's share of the joint venture's proceeds. The Indonesian oil venture was organized as a production sharing agreement. Pursuant to the terms of the organizational documents, Travelers filed a Section 761(a) election with the IRS not to be treated as a partnership for purposes of IRS Code Subchapter K. On its federal income tax returns from 1975 through 1980, Travelers reported its share of the oil venture's gross income and claimed a foreign tax credit for its share of the taxes paid to Indonesia.[3] The parties agree that Travelers is entitled to a foreign tax credit for the Indonesian taxes but disagree on its method of computation and hence its amount.

On its tax returns for the years 1975 through 1978, Travelers determined its foreign tax credit limitation by excluding a policyholders' share from its Indonesian oil investment yield. To arrive at its foreign source taxable income, Travelers went through three steps:

1.   foreign investment yield
&minus;  § 809(a) policyholders' share
----
=  foreign taxable investment income

2.   foreign investment yield
&minus;  §§ 804–06 policyholders' share
----
=  foreign gain from operations

3.   foreign taxable investment income
+  50% of the difference of foreign gain from operations over foreign taxable investment income
----
=  foreign source taxable income

**1.** During the tax years in issue, Travelers filed a consolidated tax return for a group of companies which included plaintiff, Travelers Insurance Company, Travelers Life Insurance Company, and Travelers Life and Annuity Company. Travelers Insurance Company was the investor in the Indonesian oil venture at issue and is referred to herein as "Travelers."

**2.** Unless otherwise indicated, the code provisions discussed in this opinion refer to the Internal Revenue Code as in effect in 1975 through 1980. Most of the statutes involved in this case have been revised or repealed since 1980.

**3.** For purposes of the foreign tax credit, IRC Section 907(a) generally reduces the amount of any foreign oil and gas extraction taxes to be taken into account to an amount equal to the foreign oil and gas extraction income (FOGEI) times the Section 11 United States corporate tax rate.

Thus, for example, Travelers' computed its 1975 foreign tax credit in the following manner:

| | | |
|---|---|---:|
| 1. | Indonesian oil investment yield | $3,074,936 |
| | — policyholders' share of 66.82% | 2,054,970 |
| | — small business deduction [4] | |
| | = Indonesian taxable investment income | $1,019,966 |
| | | |
| 2. | Indonesian oil investment yield | $3,074,936 |
| | — policyholders' share of 47.52% [5] | 1,461,370 |
| | — small business deduction | |
| | = Indonesian gain from operations | $1,613,566 |
| | | |
| 3. | taxable investment income | $1,019,966 |
| | + 50% of Indonesian gain from operation over taxable investment income | 296,800[6] |
| | = foreign source taxable income | $1,316,766[7] |

In the years 1979 and 1980, instead of the above method, plaintiff used the "within and without" method of calculating its taxable income. Under this method, plaintiff's foreign oil and gas extraction income (FOGEI) was computed by determining plaintiff's life insurance company taxable income (LICTI) with and without all items of income and expense attributable to the Indonesian operations. However, Travelers now argues for an entirely different computation from either the within and without method or the calculation used in 1975 through 1978. Plaintiff contends that life insurance companies are required to compute FOGEI in the same manner as other taxpayers in accordance with the rules set forth in IRC Section 907. Thus, plaintiff asserts, its FOGEI is properly computed in exactly the same manner as R & B's: as an amount equal to the partner's distributive share of the joint venture's gross income less the distributive share of

---

**4.** Because the small business deduction is comparatively minuscule, the parties ignore it in their briefs.

**5.** The policyholders' shares vary based upon rates of interest assumed by the company and the calculations required by the U.S. Life Insurance Company Income Tax Return Form 1120L. As explained below, the Section 809 policyholders' share is the required interest portion of the reserves established for payment of claims and is calculated by multiplying the assumed interest rate by the mean of the reserve amount at the beginning and end of the taxable year. The Section 804–806 policyholders' share is determined by dividing policy liability requirements by the investment yield.

**6.** This figure results from the subtraction of Travelers' Indonesian taxable investment income from its gain from the Indonesian oil operations and the multiplication of the difference by .5:

| | |
|---:|---:|
| $1,613,566 | 593,600 |
| 1,019,966 | ×.5 |
| 593,600 | 296,800 |

**7.** Defendant's Appendix B, Exhibit 5 at 212.

the joint venture's expenses.[8] Defendant asserts that this proposed method is incorrect.

Defendant notes that Travelers is properly taxed according to the rules governing life insurance companies. The government asserts that Travelers must exclude a policyholders' share from the investment yield from the Indonesian oil joint venture in computing its Foreign Oil Related Income (FORI).[9] In addition, the government admits that its computation of Travelers' FORI for 1975 and 1978 was incorrect but contends that this error was in plaintiff's favor. Accordingly, defendant claims that it is entitled to an offset for those taxable years. Travelers argues that the Code's foreign tax credit provisions provide no basis for computing FOGEI with a policyholder's share exclusion and that this computation would result in creditable foreign taxes in an amount substantially less than Congress intended. The admission of both sides that their initial determinations were incorrect provides a striking illustration of the incredible complexity of this area of the tax code. It certainly appears to argue that we have created a system that may even be too complex for the highly sophisticated tax lawyers and accountants who must work with it.

## DISCUSSION

### I. STATUTORY FRAMEWORK

The initial question in this case is whether plaintiff should be taxed on its Indonesian oil income as a partner in the joint venture, or as a life insurance company investor. To arrive at the answer to this question, it is necessary to examine the statutory scheme for foreign investment and life insurance income taxation. That is, the court must determine whether Sections 901, 904 and 907 (which provide for the foreign tax credit) are modified by Sections 802, 804, 809 and 841 (the relevant life insurance company taxation provisions).

### A. The Foreign Tax Credit Limitation

■ The foreign tax credit rules are designed to prevent double taxation of United States taxpayers' foreign operations while preventing those taxpayers from using their foreign operations to reduce the tax on their domestic operations. Section 901 provides for a foreign tax credit subject to the limitations of Section 904. Section 904(a) provides that "[t]he total amount of the credit taken under Section 901(a) shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources without the United States ... bears to his entire taxable income for the same taxable year." 26 U.S.C. 904(a) (1954). This limitation can be expressed by the following equation:

$$\text{total pre-credit U.S. taxes} \times \frac{\text{foreign source taxable income}}{\text{total worldwide taxable income}} = \text{limitation}$$

---

**8.** Subsequent to filing its income tax returns, Travelers filed refund claims arguing for this computation of its FOGEI for 1975 through 1980. Thus, the government has no variance objection to raise here.

**9.** When discussing the foreign tax credit limitation, Travelers speaks in terms of "FOGEI" and defendant in terms of "FORI". The parties agree that numerically FOGEI and FORI are the same. Section 907(c) defines FOGEI and FORI the same except that FORI includes certain oil related business activities which are not relevant here. Travelers uses the term "FOGEI" because it is arguing that section 907(a) is the effective limitation while 907(b) "has virtually no impact ... because section 907(a) already has operated to limit the creditable taxes to an amount equal to the U.S. taxes paid on FOGEI." Plaintiff's Brief in Support of Plaintiff's Opposition to Cross–Motion of the United States at 3. Defendant similarly argues that "[s]ection 907(a), limiting the amount of creditable foreign taxes, does not affect the result here. Of greater significance ... [is] section 907(b) [which] re-

*Motors Insurance Corp. v. United States,* 208 Ct.Cl. 571, 575 (1976). The critical factor in determining the amount of the foreign tax credit limitation is the fraction representing foreign source taxable income (the numerator) over the worldwide taxable income (the denominator). Obviously, the larger the fraction, the larger the potential credit.

In 1975, Congress enacted Section 907, which provides special rules for the allowable tax credit for foreign oil income. For purposes of the foreign tax credit, Section 907(a) reduces the amount of any foreign oil and gas extraction taxes to FOGEI multiplied by the Section 11 corporate tax rate.[10] Section 907(b) applies the same limitation fraction as provided in Section 904, but substitutes foreign oil related income (FORI) in the numerator. Thus, the difference between Sections 907(a) and 907(b) can be expressed algebraically as follows:

Section 907(a):

$$\text{FOGEI} \quad \times \quad \text{corporate tax rate} \quad = \quad \text{limitation}$$

Section 907(b):

$$\text{total pre-credit U.S. taxes} \quad \times \quad \frac{\text{FORI}}{\text{total worldwide taxable income}} \quad = \quad \text{limitation}^{11}$$

---

Under Section 907(c)(3)(D), FOGEI and FORI are defined as including the foreign source income of domestic corporations as well as "the taxpayer's distributive share of the income of partnerships." Plaintiff argues that the foreign credit limitation analysis stops here as Section 907 expressly recognizes partnership income in computing FOGEI and FORI, but is silent as to life insurance company income.

quires a separate foreign tax credit limitation computation for taxes imposed upon FORI." Reply Brief for the United States at 8. Thus, the parties simply use the terminology of the subsection they view as controlling.

**10.** For example, assume that a corporation's FOGEI was $100 and the corporation had paid $40 in foreign taxes. If the corporation was subject to a 30% domestic tax rate, only $30 would be creditable under section 907(a), as foreign taxes are reduced by the amount by which such taxes exceed the corporation's FOGEI times the corporate rate.

**11.** Defendant provides the following example to illustrate the application of the foreign tax credit limitation:

Assume that Corporation X earns $100 from United States operations and $100 from British operations in one year. Assume further that the applicable United States tax rate is 30 percent, while the British tax rate is 50 percent, and that the British tax of $50 is creditable under Section 901(b). As Corp. X has foreign source taxable income of $100 and world-wide taxable income of $200, and the United States pre-credit tax is $60 ($200 × 30%), the foreign tax credit limitation is expressed algebraically as follows:

$$\frac{\$100}{\$200} \quad \times \quad \$60 \quad = \quad \text{Foreign tax credit limitation}$$

Thus, Corp. X receives a foreign tax credit of $30, the equivalent of the United States tax rate applied against the foreign source taxable income. The combined tax burden upon Corp. X's British operations has been reduced from $80 ($30 United States tax and $50 British tax) to $50.... Corp. X thus earns the same $50 in after tax income from its British operations as a British company engaged in the same business.

Cross–Motion of the United States for Partial Summary Judgment at 16 n. 9.

### B. Life Insurance Company Taxation Rules

The government contends that the foreign tax credit limitation fraction is further modified where the taxpayer is a life insurance company. Under Section 841:

> [t]he taxes imposed by foreign countries ... shall be allowed as a credit against the tax of a domestic insurance company subject to the tax imposed by section 802, 821, or 831, to the extent provided in the case of a domestic corporation in section 901 (relating to foreign tax credit). For purposes of the preceding sentence ... the term "taxable income" as used in section 904 means—
>
> (1) in the case of the tax imposed by section 802, the life insurance company taxable income (as defined in section 802(b)).

26 U.S.C. § 841. Defendant asserts that the Code thus establishes that "taxable income," as used in both the numerator and the denominator of the foreign tax credit limitation fraction, is determined by reference to life insurance company taxable income (LICTI). LICTI is defined under Section 802(b) as the sum of:

> (1) the taxable investment income (as defined in section 804) or if smaller, the gain from operations (as defined in section 809)
>
> (2) if the gain from operations exceeds the taxable investment income, an amount equal to 50 percent of such excess, plus
>
> (3) the amount subtracted from the policyholders' surplus account for the taxable year, as determined under section 815.

26 U.S.C. § 802(b).[12]

Sections 804(a)(1) and 809(a)(1), in turn, define taxable investment income and gain from operations as excluding the "policyholders' share of each and every item of investment yield." Defendant argues that this language clearly requires exclusion of the policyholders' share of investment yield in computing Travelers FORI. Thus, in the government's view, the foreign tax credit fraction is further altered:

$$\text{total pre-credit U.S. taxes} \quad \times \quad \frac{\text{foreign source LICTI attributable to FORI}}{\text{worldwide LICTI}} \quad = \quad \text{limitation}$$

Thus, the court must engage in a two-tiered inquiry in analyzing this case. First, the court must resolve the parties arguments under section 907(a), (b), and (c). To do so, the court must determine: (A) which subsection of 907 is the critical limitation on the foreign tax credit, and (B) whether section 907(c) operates to allow plaintiff to treat its FOGEI/FORI as the distributive share of a partnership with R & B. Assuming that the court concludes that the government has properly applied section 907(a) and (b), and that plaintiff cannot compute its FOGEI/FORI in the same manner as its partner, the court must then turn to the second tier of inquiry: whether the life insurance taxation rules modify the foreign tax credit limitation. To resolve that issue, the court must also determine two questions: (A) whether the government has applied the applicable sourcing rules in excluding the policyholders' share from Travelers' FOGEI/FORI, and (B) if it has not, whether plaintiff's computation would constitute an impermissible change in accounting method.

### II. THE PARTIES' SECTION 907 DISPUTE

#### A. Sections 907(a) and (b) and the Foreign Tax Credit Limitation

Plaintiff asserts that defendant's computation of the foreign tax credit limitation

---

**12.** The three elements of LICTI are also called "phases." Travelers did not have any Phase III, or subtraction from policyholders' surplus account, income for the years in question.

ignores Section 907(a). In Travelers' view of Section 907(a), its creditable taxes are reduced to an amount equal to the product of FOGEI multiplied by the Section 11 corporate tax rate. Section 907(b) then applies a special foreign tax credit limitation to the reduced amount of creditable taxes by requiring that FORI be the numerator in the limitation fraction. In support of this contention, Travelers cites the Treasury Department's preamble to the regulations promulgated under Section 907:

> Section 907(a) reduces otherwise creditable foreign income taxes imposed on "foreign oil and gas extraction income" to a certain percentage of this income.
>
> \*   \*   \*   \*   \*   \*
>
> Section 907(b) creates a separate section 904 limitation for "foreign oil related income". Section 907(c)(2) defines foreign oil related income to include income from "downstream" trade or business, such as the processing of minerals from oil or gas wells into primary products....
> Section 907(a) applies before section 907(b). To summarize, section 907(a) initially reduces creditable foreign oil and gas extraction taxes to a certain percentage of the foreign oil and gas extraction income. Section 907(b), on the other hand, in essence then provides that the extraction taxes as reduced by section 907(a) along with the creditable taxes on the income from downstream trades or businesses can only be used under section 904 to reduce the U.S. tax on foreign oil related income. Section 907(a) does not reduce the creditable foreign taxes imposed on the income from downstream trades or businesses.

T.D. 7961, 1984–2 C.B. 130, 132.

Defendant contends that it is irrelevant in this case whether Section 907(a) is applied before 907(b). The government argues that Section 901(a) limits the allowable foreign tax credit to the lesser of (1) the limitation upon creditable taxes, computed pursuant to Section 907(a), and (2) the special foreign tax credit limitation, computed pursuant to Section 907(b). As FOGEI and FORI are computed independently, the government asserts that basic algebra proves that it makes no difference which limitation is computed first.

While the Treasury Department's preamble is instructive, the court fails to see why applying Section 907(a) first in this case would be of any consequence. The preamble provides that the only change between the computations under Sections 907(a) and (b) is that the former "does not reduce the creditable taxes imposed on the income from downstream trades or business." As the parties agree that downstream trade income is not at issue in this case, and that plaintiff's FOGEI and FORI are identical, the order of application of the subsections is not critical. Under defendant's computation, Section 907(b) imposes the greatest restriction upon Travelers' allowable foreign tax credit related to the Indonesian oil venture. Thus, Section 907(b) provides the lesser foreign tax credit under Section 901(a), and is the operative limitation in this case.[13] However, even assuming that Section 907(a) must be applied first, plaintiff cannot show that it is entitled to treat its FORI as equal to the distributive share of income and expenses from the Indonesian oil venture without reference to the life insurance company taxation rules.

**B. Whether Section 907(c) requires that Travelers be treated as a partnership.**

■ Plaintiff argues that because Section 907(c)(3)(D) expressly provides that FORI includes the taxpayer's distributive share of the income of a partnership engaged in a foreign oil business, Travelers should be taxed in the same manner as R & B. Defendant responds that Section 907(c) is inapplicable here as Travelers elected under Section 761(a) not to be treated as a partner under Subchapter K of the Code. The court finds that both the Section 761 election and the language of Section 907(c) preclude the treatment of plaintiff's income as the distributive share of a partnership in this case.

---

**13.** For that reason, the court uses the term "FORI" in the remainder of this opinion.

Travelers does not dispute that it expressly elected to exclude the Indonesian oil venture from the partnership taxation rules codified in Subchapter K (Sections 701–761). Rather, plaintiff contends that its election is irrelevant because it was limited to Subchapter K. However, "distributive share of partnership income" under Section 907(c)(3)(D) is defined only in Section 704. Section 704, of course, is one of the provisions indisputably effected by Travelers' election. Plaintiff cites *Bryant v. Commissioner*, 46 T.C. 848, 864, 1966 WL 1320 (1966), *aff'd* 399 F.2d 800 (5th Cir.1968), for the proposition that a Section 761 election is ineffective for purposes unrelated to Subchapter K. In that case, however, the court found that Section 761 and the investment tax credit provision at issue were not "interdependent." *Id.* In this case, Section 907(c) and Subchapter K are plainly interdependent as the latter defines the terms of the former. The court notes that Travelers admitted in its opening brief that "the principles of Section 704 govern in determining FOGEI."[14] Thus, Travelers' election under Section 761 operated to render Section 907(c)(3)(D) inapplicable to its FORI computation.

Even if Travelers' election did not render Section 907(c)(3)(D) inapplicable, plaintiff misconstrues the provision. Section 907(c)(3)(D) does not require, as plaintiff suggests, that Travelers be taxed as a partner in the Indonesian oil venture. As set forth above, Section 907(c)(3) provides:

The term "foreign oil and gas extraction income" and the term "foreign oil related income" include—

\* \* \* \* \* \*

(D) the taxpayer's distributive share of the income of partnerships. . . .

(Emphasis Added). While partnership income is included in the definition of FOGEI and FORI, the "distributive share of income from partnerships" is not the exclusive definition. The legislative history of Section 907 indicates that Congress intended a very broad definition of FOGEI and FORI to ensure that United States oil companies could not avoid application of the Section 907 rules by creatively structuring their foreign oil operations.[15] Thus, FORI includes income from a variety of business arrangements. Travelers cites no authority for the proposition that Section 907(c) is limited to any particular oil extraction business arrangement or that the statute excludes the computation of foreign source taxable income for life insurance companies.

In support of its contention that Section 907(c)'s partnership language provides the exclusive method of computing its foreign tax credit limitation, plaintiff cites *Federated Mutual Implement and Hardware Insurance Co. v. Commissioner*, 266 F.2d 66 (8th Cir.1959) and *Northwestern Mutual Fire Ass'n v. Commissioner*, 181 F.2d 133 (9th Cir.1959). However, plaintiff's reliance on these cases is misplaced. Both cases stand for the proposition that when the statute provides the exclusive method

---

**14.** Plaintiff's Brief in Support of Motion of Plaintiff for Partial Summary Judgment at 14.

**15.** As set forth in the Committee Report on the Energy Tax and Individual Relief Act of 1974:
There are various forms of arrangements used today whereby U.S. petroleum companies which operate overseas extract their own production of oil and gas and also purchase from the foreign government the foreign government's share of the oil and gas production. In addition, there are arrangements whereby the petroleum company which conducts oil and gas extraction operations sells a percentage or a portion of its production to a second petroleum company who pays taxes on the operations to the foreign government. Due to the changing relationships between the for-

eign governments of the countries where oil and gas wells are located and the petroleum companies operating in those countries, it is quite possible that other types of arrangements similar to the ones described above will arise under which a petroleum company no longer extracts crude oil products but purchases and sells crude oil . . . on behalf of the foreign government. To the extent that profits on these types of arrangements are profits from the extraction or crude oil [this bill] treats them as income. . . .
H.Rpt. No. 93–1502, 93d Cong.2d Sess. at 64–65 (1974). Thus, Congress intended that, however structured, oil extraction businesses would be subject to the Section 907 rules for the income derived in foreign operations.

for computing the foreign tax credit limitation, that method applies even in the case of a mutual insurance company. In *Federated Mutual* and *Northwestern Mutual,* the operative mutual insurance company tax provisions required computation of taxable income as the greater of "normal-tax net income" or "gross amount of income." Normal tax-net income was defined as that derived from net investment income; gross income included interest, dividends and premiums less dividends to policyholders. The numerator of the foreign tax credit limitation fraction was statutorily defined as "normal-tax net income" earned in the foreign country, while the denominator was defined as the taxpayer's entire normal-tax net income.[16] Internal Revenue Code of 1939, Section 131. Thus, the 1939 Code provided two special bases for mutual insurance companies, neither of which was the generally applicable tax base of normal-tax net income as defined for the foreign tax credit limitation.

In *Northwestern Mutual,* the taxpayer originally computed its limitation by adopting the ratio of gross amount of income from Canadian sources to gross amount of income from all sources. Northwestern later filed for a refund claiming that the proper ratio in the limitation was normal-tax net income from Canada to normal-tax net income from all sources. The court allowed the refund because the statute's clear and unambiguous language required such a computation. In so holding, the court acknowledged that the United States taxes imposed upon Northwestern Mutual during the years in question were not based upon its normal-tax net income but rather upon its gross income.

In view of that fact, limitation of the foreign tax credit by a ratio of normal-tax net income appears to have no logical basis. But as legislative history reveals,

mutual insurance companies such as petitioner present unusual problems of administration. Resolution of these problems has been made, if empirically, by the Congress. Our function is at an end when we have determined the scope of the Congressional action.

*Id.* at 136. The court in *Federated Mutual* reached the same conclusion, holding that the statutory language requiring use of "normal-tax net income" in computing the limitation applied regardless of whether the company's taxable income was computed using gross amount of income as an alternative tax base.[17]

Thus, these cases stand for the wholly unremarkable proposition that courts are bound by relevant statutory provisions. This explains why both parties in this case find *Federated Mutual* and *Northwestern Mutual* supportive of their respective positions. However, what is at issue in this case is which statutory provision controls, or whether both Sections 907 and 841 can be read compatibly. "The courts are not at liberty to pick and choose among congressional enactments, and where two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective." *Morton v. Mancari,* 417 U.S. 535, 551, 94 S.Ct. 2474, 2483, 41 L.Ed.2d 290 (1974); see also *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1018, 104 S.Ct. 2862, 2880–81, 81 L.Ed.2d 815 (1984) (The better interpretation of arguably conflicting statutes capable of co-existing is one which gives force to both). As plaintiff can cite to no "clearly expressed congressional intent," this court must, if possible, adopt a construction which allows Sections 907 and 841 to co-exist. Plaintiff's claimed entitlement to treatment as a partnership for this purpose must thus be rejected.

---

**16.** Therefore, under the 1939 Code, "normal-tax net income" for mutual insurance companies was defined differently than the normal-tax net income in the foreign tax credit limitation. See E. OWENS, THE FOREIGN TAX CREDIT, at 210–211 (1961).

**17.** However, unlike the predecessor provision considered in *Federated Mutual,* section 907(c)

does not expressly provide the exclusive method of determining the numerator in the foreign tax credit limitation fraction. As explained above, Section 904(a) provides that the numerator shall be the "foreign source taxable income." While that can be determined by reference to partnership income under 907(c), it can also be computed by reference to the Section 841 LICTI.

III. THE ALLOCATION OF EXCLUSIONS AND DEDUCTIONS FROM PLAINTIFF'S FORI

As explained above, Section 841 provides that where the taxpayer is a life insurance company, foreign source taxable income (FORI in this case) is statutorily defined in terms of LICTI. Section 802(a) provides that the two principal components of LICTI are taxable investment income and gain from operations. Both components are defined as excluding the "policyholders' share of each and every item of investment yield." Sections 804(a)(1) and 809(a)(1). Thus, defendant argues that Travelers' FORI is computed by excluding the policyholders' share from plaintiffs' Indonesian oil investment yield. In addition, the government contends that the principle of using the same methodology in computing the numerator and denominator of the foreign tax credit limitation fraction requires the exclusion of a policyholders' share from Travelers' Indonesian oil investment yield.

Plaintiff argues that even if the above life insurance company taxation rules apply in computing its foreign tax credit limitation, these rules lead to the result urged by Travelers. Travelers contends that defendants' calculation of FORI does not follow the methodology required under general income sourcing rules. Plaintiff asserts that under the general source rules, no part of its excess gain from operations is allocable to the Indonesian oil gross income. In addition, Travelers argues that the policyholders' share exclusion is, in fact, a deduction which must be allocated only to its domestic insurance activities. These arguments, and defendant's responses to them, are addressed below.

A. The General Income Sourcing Rules: Sections 861–864

1. *Travelers' Excess Gain From Operations in the FORI Computation*

In 1976–1977 and 1979–1980, plaintiff asserts that its United States tax base was "phase 2 positive." That means that plaintiff was entitled under Section 802(b) to defer recognition of one-half of its gain from operations (GFO) over its taxable investment income. Plaintiff contends that its phase-two GFO is a special deduction allocated to gross income under the income sourcing regulations underlying Sections 861–864. Under Treas.Reg. § 1.861–8(b)(2), "[a] deduction shall be considered definitely related to a class of gross income and therefore allocable to such class if it is incurred as a result of, or incident to, an activity or in connection with property from which such class of gross income is derived." Travelers argues that, under this regulation, its excess GFO is attributable to gross income derived from insurance activities, not to plaintiff's Indonesian oil income. Plaintiff asserts that defendant has ignored these sourcing rules in computing its FORI by creating a Section 802(b) deduction sourced to the Indonesian oil income.

Defendant responds that it has not "created" an excess GFO deduction in computing Travelers' FORI. The government contends that it simply followed the Section 802(b)(2) requirement of deferring income recognition of 50 percent of the amount by which gain from operations exceeds the taxable investment income. Thus, defendant argues that the excess GFO is a deferral or exclusion from income and the Treas. Reg. 1.861–8 rule for sourcing deductions is inapplicable. The dispute over what may be properly termed a deduction or exclusion is central to the policyholders' share issue in this case. Therefore, the court will consider the parties' excess GFO arguments in that context below.

2. *The Policyholders' Share Exclusion in the FORI Computation*

Life insurance companies are taxed differently from other taxpayers because most of their current revenue is obligated to pay future claims. The three-phase system of life insurance taxation was designed "in recognition of the traditional concept that a life insurance company should not be taxed on that part of its income which was required to be set aside as a reserve to meet the company's contingent obligations to its policyholders." MERTENS LAW OF FEDERAL INCOME TAXATION § 44A.02 at 16. To

implement this concept, a life insurance company is entitled to a deduction for increases to its reserves as premiums and investment income are received. A policyholders' share is excluded from "each and every item of investment yield" to ensure that only the company's share is subject to tax. D. VAN MIEGHAM AND T. BROWN, FEDERAL TAXATION OF INSURANCE COMPANIES, Section 1.25 (1987).

Plaintiff contends that the policyholders' share exclusion is part of the reserve deduction and is, therefore, allocable to its U.S. insurance related-income under Treas. Reg. 1.861–8. Travelers points out that the parties agree that no part of plaintiff's deductions for its insurance-related income (such as reserve increases or benefits paid to policyholders) is sourced to Indonesia. Thus, plaintiff asserts, the policyholders' share cannot be so allocated as it is directly related to the increases in reserves. Travelers views the policyholders' share as the required interest portion of plaintiff's insurance reserves, which represent an anticipation of claims for policy benefits. As such, Travelers asserts that the policyholders' share must be treated consistently with the deduction for reserve increases and policy benefits and be sourced to domestic insurance related activities.

Defendant contends that Treas.Reg. § 1.861–7(a) treats income from the sale of personal property as derived from the country where the property is sold. Thus, the government asserts that Travelers' income from the sale of oil is sourced to Indonesia. Defendant then argues that Sections 804(a) and 809(a) require exclusion of the policyholders' share of each and every item of investment yield and, therefore, reduce the amount of Indonesian source oil income recognized. Defendant argues that Treas.Reg. § 1.861–8 applies only to the sourcing of expenses, losses and other deductions from the Indonesian

oil venture. In the government's view, Treas.Reg. § 1.861–8 is otherwise inapplicable because the policyholders' share is an exclusion and not a deduction. Thus, in order to decide how the policyholders' share is to be sourced, the court must determine whether the policyholders' share is a reduction in the deduction created by an increase in plaintiff's insurance reserves.

Both parties present coherent arguments for their positions on the nature of the policyholders' share. Defendant relies upon the express characterization of the policyholders' share as an "exclusion" under Sections 804(a)(1) and 809(a)(1). The government points out that the tax law distinguishes between exclusions and deductions. For example, the insurance provisions distinguish between the policyholders' share exclusion from gain from operations (809(a)(1)) and deductions from the same (809(d)). In addition, the legislative history indicates that Congress specifically designated the policyholders' share as an exclusion after initially labeling it as a deduction.[18] Thus, the government would have the court treat as an exclusion anything so labelled.

Although appealing, as bright line tests always are, the court cannot accept defendant's contentions. As the court stated in *Life Insurance Company of Georgia v. United States*, 16 Cl.Ct. 359 (1989), "it is incorrect to view an expense as 'the immediate occasion, or the result of, the receipt of income." *Id.* at 362. Instead, such costs are the result of activities that produce income. "The guiding discipline, in other words, is one in which the 'why' of the expense is the essential determinant of its allocation." *Id.* In this case, as plaintiff aptly points out, the "why" of the policyholders' share is a dollar-for-dollar reduction in the deduction for increases in reserves.[19]

---

**18.** The House version of the Life Insurance Company Income Tax Act of 1959 treated policyholder requirements as a deduction. The Senate version characterizing the policyholders' share as an exclusion was ultimately embodied in the statute. S.Rept. No. 291, 86th Cong., 1st Sess. (1959), U.S.C.C.A.N. 1575.

**19.** Defendant argues that even if the policyholders' share is a deduction, the source of those deductions is the situs of the investment. In support of this contention, the government relies primarily upon *Commissioner v. Ferro–Enamel Corp.*, 134 F.2d 564 (6th Cir.1943) and *Royal Insurance Co. v. Commissioner*, 38 B.T.A.

The policyholders' share percentage is determined by dividing the required interest portion of the reserves by the investment yield. Under 809(a)(2), required interest is defined as the sum of the products obtained by multiplying:

(A) each rate of interest required, or assumed by the taxpayer, in calculating the reserves described in section 810(c), by

(B) the [mathematical] means of the amount of such reserves computed at that rate at the beginning and end of the taxable year.[20]

Under Section 810, the amount of net increase or decrease in reserves "must first be reduced by the amount of investment yield not included in the gain or loss from operations for the taxable year by reason of Section 809(a)(1)." Treas.Reg. § 1.810–2(c)(1). Thus, gain from operations is reduced by the policyholders' share of investment yield under Section 809(a) and then increased by the same amount by the adjustment to year-end reserves in Section 810.

However, only the year-end reserves are reduced by the policyholders' share of investment yield deduction. Unlike the year-end reserves, the opening reserves for the following year are not reduced by the policyholders' share. Therefore, the life insurance company must each year recognize the full amount of investment yield, obtain a full deduction for reserve increases, and prorate tax exempt interest and dividends received to the reserves. Thus, plaintiff is correct that the exclusion of the policyholders' share of investment yield is not an exclusion from gross income. Because the policyholders' share applies to a net figure, it is accurately viewed as a deduction. In reality, the policyholders' share exclusion is the required interest portion of the reserve deduction which is fully recouped by the corresponding decrease in the year-end reserves under Section 810.[21]

955 (1938). However, those cases involve the sourcing of capital losses on the disposition of capital assets and not the allocation of deductions to sources of income. Those losses would not have been incurred but for the investment. In the instant case, the policyholders' share would have been required whether or not plaintiff had invested in the Indonesian oil venture.

20. In 1975 for example, Travelers' Section 809 policyholders' share was determined by the following calculation:

| | 1. Rate | 2. Beginning of Year | 3. End of Year | 4. Mean of Col. 2 & 3 | 5. Col. 1 × 4 |
|---|---|---|---|---|---|
| 1. 810(c)(1) reserve | | | | | 133,810,334 |
| 2. 810(c)(3) | 3.2880 | 145,542,343 | 147,459,588 | 146,500,968 | 4,816,880 |
| 3. 810(c)(4) | 7.9986 | 320,774,041 | 644,599,048 | 482,686,565 | 38,608,146 |
| 4. 810(c)(5) | 7.7309 | 115,674,801 | 140,051,208 | 127,863,005 | 9,884,911 |
| 5. 810(c)(6) | 6.4524 | 87,872,679 | 95,543,747 | 91,708,213 | 5,917,410 |

Required Interest (lines 1 through 5)          193,037,681

Defendant's Exhibit B 212.

21. A similar scheme was encountered in *Allstate Insurance Company v. United States*, 936 F.2d 1271 (Fed.Cir.1991). In that case, upon submission of a claim from automobile insurance policyholders, the plaintiff would evaluate the claim and make an addition to its unpaid loss reserves. Allstate later paid many of those claims in sums different from the original claimed amount. Upon payment, Allstate subtracted the original amount it had estimated from the unpaid loss reserves and added the amount actually paid to its paid losses account. Thus, the unpaid loss reserves reflected Allstate's potential future obligations. After it paid the claim, Allstate could seek recovery from a third party (subrogation) or sell the damaged automobile for scrap (salvage). Greater subrogation amounts reduced the losses incurred deduction and increased Allstate's gross income. Plaintiff argued that it was unnecessary to include as income that portion of the subrogation and salvage received which related to earlier losses deducted without tax benefit.

The Federal Circuit noted that the tax benefit rule allows a taxpayer to exclude from income amounts recovered from a previously deducted loss to the extent the previous deduction generated no tax benefit. Thus, the tax benefit rule applied to exclude salvage and subrogation recoveries from Allstate's income despite the government's argument that the statute provided that such recoveries were an offset to the deduction for losses incurred and not an item of gross income. In so holding, the court of appeals found that the tax structure resulted in a "dol-

In determining the allocation of an item of income, the court must look to its substance. *Bank of America v. United States*, 230 Ct.Cl. 679 (1982). As the court has determined that the policyholders' share is directly related to the deduction for reserves, the deduction sourcing rule of Treas.Reg. § 1.861–8(b)(2) applies.[22] Thus, the policyholders' share is properly allocated to Travelers' gross income from its domestic insurance business and not to its Indonesian oil investment activities.[23]

### B. Change in Accounting Method

■ Defendant argues that even if the policyholders' share is a deduction to which Treas.Reg. § 1.861–8 applies, plaintiff's proposed FORI computation would constitute an impermissible change in accounting method under Section 446(e). Section 446(e) provides:

> a taxpayer who changes the method of accounting on the basis of which he regularly computes his income in keeping his books shall, before computing his taxable income under the new method, secure the consent of the Secretary.

Defendant argues that because Travelers computed its foreign tax credit limitation using the same method as the Service on its returns for 1975 through 1978, Travelers' argument for a different computation violates Section 446(e). Because Travelers

never filed a Form 3115 (Request for Consent to Change Method of Accounting), defendant asserts that plaintiff may not now change its computation of FORI.

However, Treas.Reg. § 1.446–1(e)(2)(ii)(b) provides that a change in method of accounting does not encompass "errors in the computation of the foreign tax credit." A change of accounting is one which changes the treatment of a "material item." *Schuster's Express, Inc. v. Commissioner*, 66 T.C. 588, 595, 1976 WL 3710 (1976), *aff'd mem.*, 562 F.2d 39 (2d Cir.1977). A material item is any item which involves the proper time for the inclusion of an item in income or the taking of a deduction. Treas.Reg. § 1.446–1(e)(2)(ii)(a). The foreign tax credit computation takes place only after taxable income has been determined and all timing matters have been resolved.[24] Therefore, plaintiff's proposed computation does not constitute a change in accounting method under Section 446(e).

### C. The Government's Offset Claim

Defendant admits that the IRS' calculation of Travelers' FORI for 1975 and 1978 was incorrect in one "minor" respect. As explained above, Section 841 defines "taxable income" for purposes of the foreign tax credit limitation in terms of LICTI which is defined as taxable investment income and gain from operations. Foreign

---

lar-for-dollar" increase in the taxpayer's gross income. *Id.* at 1274. In the instant case, plaintiff's gross income includes the policyholders' share as it reduces the deduction for increases in reserves dollar-for-dollar.

**22.** Because the excess GFO deduction discussed above is attributable to gross income derived from insurance activities, it is similarly sourced under Treas.Reg. § 1.861–8(b)(2).

**23.** This conclusion is supported by the analogous Section 953 regulations governing income of controlled foreign corporations. Under Section 953, certain shareholders of foreign controlled corporations are required to include in income the amounts of their "Subpart F" income. Subpart F income includes insurance income "derived from the insurance of United States risks." Treas.Reg. § 1.953–4(h) Example (d) determines the life insurance company share of investment yield attributable to foreign risks by subtracting the required interest attributable to the reserves on foreign risks from the total investment income allocable to those risks.

Thus, the policyholders' share of investment risks is equated with required interest and is an expense allocable to the source of the insurance risks to which it relates and not to all items of investment yield.

**24.** Travelers also asserts that its computation is permissible because it is merely the correction of an error and it may change its accounting method by filing amended returns. The government disputes this contention and relies upon *Diebold v. United States*, 891 F.2d 1579 (Fed.Cir. 1989), *cert. denied*, 498 U.S. 823, 111 S.Ct. 73, 112 L.Ed.2d 47 (1990). In *Diebold*, the court held that a taxpayer was still required to obtain consent even though it sought to amend its tax returns. *Id.* at 1583. However, the primary focus of *Diebold* was not on the amendment issue, but on whether there was a change in accounting method. Thus, *Diebold* is inapplicable here because there was no change of accounting method in this case.

tax credit principles require that both the numerator and denominator of the foreign tax credit limitation be computed on the same basis. However, the IRS' computation in 1975 and 1978 reported Travelers' FORI (the numerator) on the basis of combined taxable investment income and gain from operations, while plaintiff's worldwide taxable income (the denominator) was based upon only taxable investment income. In other words, defendant contends that the IRS excluded the wrong policyholders' share from plaintiff's FORI for those years. The government contends that this error was to Travelers' advantage and, therefore, defendant is entitled to an offset for the amount of the mistake.

As discussed above, although the life insurance tax rules apply to the foreign tax credit limitation, plaintiff has shown that defendant's exclusion of the policyholders' share from Travelers' FORI was improper. As defendant's offset claim is also based upon its assertion that a policyholders' share must be excluded from Travelers' FORI, it is unnecessary to consider the government's argument that it is entitled to an offset because the IRS excluded the wrong policyholders' share in its audit computation for 1975 and 1978. Thus, the offset claim must be denied.

## CONCLUSION

For the reasons set forth above, the policyholders' share was improperly excluded from plaintiff's Indonesian oil investment yield. Accordingly, plaintiff's motion for partial summary judgment is granted. The parties are directed to submit a joint status report within sixty days advising the court of the effect of this decision upon future proceedings in this case.

**IT IS SO ORDERED.**