BENNETT'S TRAVEL BUREAU, INC., PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 54126. Filed November 25, 1957.

*George Clott, Esq.*, and *Theodore Witkin, Esq.*, for the petitioner.
*William F. Chapman, Esq.*, and *William G. O'Neil, Esq.*, for the respondent.

FISHER, *Judge:* This proceeding involves a deficiency in income tax determined against petitioner in the amount of $13,516.47 for the taxable year ended December 31, 1949.

The issues presented for our consideration are (1) whether petitioner realized ordinary gain in the amount of $25,077.61 in 1949, upon the discharge of an indebtedness to Bennett's Oslo by the payment of the obligation in kroner after the devaluation of the krone; and (2) whether the amounts of $2,575.61 and $207.34 representing reimbursement of travel and entertainment expense and compensation to Krogh, manager of Bennett's Oslo, in relation to services rendered by Krogh in petitioner's interest, are properly deductible by petitioner as ordinary and necessary business expenses under section 23 (a), I. R. C. 1939.

### FINDINGS OF FACT.

Some of the facts are stipulated, and are included herein by this reference.

Bennett's Travel Bureau, Inc., hereinafter referred to as petitioner, is a Massachusetts corporation, with its principal office in New York, New York, engaged in the business of making travel arrangements for individuals desiring to travel in Europe. The petitioner filed its corporate tax return for its calendar year ended December 31, 1949,

with the then collector of internal revenue for the third district of New York. It maintained its books and records and reported its income on an accrual method of accounting. During the period in question, as disclosed by petitioner's corporate income tax return for 1949, 50 per cent or more of its stock was owned by Bennett's Reisebureau A/S, Oslo, Norway, hereinafter called Bennett's Oslo.

Petitioner's business was to make transportation and hotel arrangements for clients or "patrons" desiring to travel in Europe, particularly in the Scandinavian countries. A client would request travel and hotel accommodations and petitioner billed the client on the estimated costs of the trip, plus a service charge of 20 to 25 per cent. The charge was customarily paid in advance by the client, although at times clients were permitted to make an initial payment on account and pay the balance periodically. Petitioner's cash account was debited and the "Patron's Account" was credited. Petitioner issued certificates to its patrons covering hotel and transportation charges which were honored by designated business associates of petitioner including Bennett's Oslo, through which the accommodations had been contracted. Such associates, including Bennett's Oslo, then billed or transmitted "posting orders" to petitioner covering their expenditures in honoring such certificates. After translating these bills into American dollars at the prevailing rate of exchange, the patron's account would be debited for such expenditures and Bennett's Oslo (or such other company which contracted for and paid the charges) would be credited. Petitioner and Bennett's Oslo maintained a "running account" reflecting the amounts payable to the latter during the year 1949. There is no evidence of any agreement, express or implied, that Bennett's Oslo was to be reimbursed in American dollar value as of any designated date.

In September 1949, the English pound sterling was devalued. At the same time, the official rate of exchange of Norwegian kroner was changed from 4.97 kroner to the American dollar to 7.15 kroner to the American dollar.

The indebtedness to Bennett's Oslo incurred in the early part of 1949, translated into American dollar value, exceeded the amount of dollars expended later that year, after the devaluation of the krone, to pay the indebtedness in kroner, by $25,077.61.

In December 1949, the amount of said difference or surplus was debited to an account in petitioner's general ledger entitled "Bennett's-Oslo" in the amount of $25,077.61. Petitioner's general journal reflects this debit, together with balancing credit entries as follows: "Oslo Spec.–11,269" and "Currency Fluct. a/c–13,808.61." The credit entries were posted to two new accounts set up on petitioner's general ledger as of December 31, 1949. One such account, account

No. 4, was entitled "Oslo Special Account," with a credit payable to Bennett's Oslo, in the amount of $11,269, and a further credit in 1950 in the sum of $26.10. Said account was closed out between February and December 1950 by the purchase for Bennett's Oslo, of an adding machine, a bookkeeping machine, a Cadillac car, a bonus to Ivar G. Krogh, a cash remittance, a transfer of funds "To Oslo Regular, a/c," and other miscellaneous items.

The other new account was entitled "Currency Fluctuation Account," with a credit in the amount of $13,808.61. Said account is still open on the books of petitioner. Petitioner considered that this item was part of its capital, and that it was at liberty to use that amount for whatever purpose it wished.

On page 4, item 13, under the designation "Liabilities" (surplus reserves) in its corporation income tax return for the calendar year 1949, petitioner reported "For exchange fluctuation" the amount of $13,808.61.

The circumstances giving rise to the credits to the Oslo Special and Currency Fluctuation accounts were as follows: After the devaluation of the krone, it was apparent that the result would be a benefit of $25,077.61. Petitioner stated on brief that it was a wholly owned subsidiary of Bennett's Oslo. Bennett's Oslo decided that the money would be kept in this country. Bennett's Oslo also decided that the benefit was to be shared by both petitioner and itself, and that the benefit allocated to itself would be the credit subsequently credited to "Oslo Special" account, while the benefit to petitioner would be the amount subsequently credited to "Currency Fluctuation" account which they regarded as an addition to petitioner's capital. The administrators of Bennett's Oslo were also in part prompted by the belief that if the benefit were so treated, no part of it would be subject to tax either under the Norwegian corporation law or the United States income tax laws. The decision as to the application of the $25,077.61 was entirely that of Bennett's Oslo, which was in a position to dictate such disposition because of its admitted control over petitioner. There is no evidence of any preexisting agreement, express or implied, between Bennett's Oslo and petitioner, controlling the disposition or allocation as between the two companies of gains and benefits (or losses) accruing to either as a result of currency fluctuation or devaluation.

During the year 1949, there was no written agreement entered into between petitioner and Bennett's Oslo relative to the management of petitioner's affairs or the disposition of accounts payable to Bennett's Oslo.

During the year in question, Ivar Krogh was manager of Bennett's Oslo. There was no contract of employment between petitioner and

Krogh. As an added attraction to the tours arranged by petitioner, it was petitioner's practice to have Krogh open his private home to entire groups of its American patrons for a cocktail party so that they could be entertained and observe the mode of living in a Norwegian household. Also, on various occasions, when petitioner was unable to secure hotel accommodations for one of its groups on tour it would request Krogh, who is well known in Scandinavia, to travel outside of his country in order to obtain such accommodations.

Petitioner did not receive any written itemization of the expenses incurred by Krogh in performing said functions. During the year, however, when Aagaard (petitioner's vice president and manager) visited Norway, Krogh would inform him orally as to the estimated amounts expended on petitioner's behalf. At the end of each calendar year, it was petitioner's practice to vote a so-called bonus for Krogh to reimburse him for said expenditures and to give him an additional sum, small in amount, as compensation for his services. The total lump-sum amount thereof was fixed by Aagaard.

Petitioner's general journal for December 1949 contains an entry debiting the "Bonus" account and crediting the bonus payable account ("Bonus-Guyner Krogh") in the amount of $2,575.61. On page 1, line 17, of its return under the heading "Salaries and Wages," petitioner claimed this amount as a deduction by including said amount in a total sum of $19,080.61. The amount of $2,575.61 was paid to Krogh in part by cash payments and the remainder by certain purchases made for his account.

An account in petitioner's general ledger entitled "Surplus or Deficit" contains a debit entry as of January 1, 1949, as follows: "Com. a/c 1948–Gaevar [sic] Krogh, for year 1948–$622.01." In its return for 1949, petitioner deducted this sum as "other deductions authorized by law." Schedule K attached to said tax return lists said amount as "1948 Bonus." The sum of $622.01 was paid in 1949 and is composed of two separate checks, one in the sum of $414.67 made payable to Gunnar Aagaard and dated February 23, 1949, and the other in the sum of $207.34 and made payable to Josephine Reilly, cashier, and dated March 23, 1949. The check in the sum of $207.34, payable to Reilly, was issued to reimburse petty cash for expenditures made on behalf of Krogh in payment of a "bonus" to him for the year 1948. The check, in the sum of $414.67, payable to Aagaard, was in payment of a "bonus" for the year 1948. (Respondent concedes that the item of $414.67 is deductible by petitioner for the year in question.)

The respective amounts of $2,575.61 and $207.34 accrued in the taxable year 1949 are ordinary and necessary business expenses of petitioner for that year.

## *I.*

The respondent, in his statutory notice, determined that the amount of $25,077.61 is ordinary income taxable to petitioner in the year 1949, stating that the increase resulted from the fact that petitioner accrued expenses payable to Bennett's Oslo at the exchange rate existing early in 1949, whereas said expenses when paid were paid at the lower exchange rate then existing due to devaluation of the Norwegian krone by the Norwegian Government in or about September 1949. Respondent, on brief, argues that petitioner's payment of its accrued indebtedness subsequent to the devaluation of the krone resulted in taxable gain from a separate investment in foreign exchange. Contesting respondent's determination on either approach, petitioner contends that Bennett's Oslo was its parent corporation and the true owner of the surplus dollars arising from the exchange fluctuation, and that the amount in question was always considered to be the exclusive property of Bennett's Oslo. We hold for the respondent for the reasons stated hereinafter.

It is clear that where a taxpayer purchases goods or services in a foreign country, the cost thereof must be arrived at by converting the foreign currency into dollars at the rate of exchange at the time of purchase. *Bernuth Lembcke Company, Inc.*, 1 B. T. A. 1051, 1054 (1925); 2 Mertens, Law of Federal Income Taxation, sec. 1604, p. 7. Where the purchase is made abroad in foreign currency on credit and payment is remitted to the vendor at a later period when the rate of exchange is different, however, we have repeatedly held that the credit transaction is in effect an investment or speculation in foreign exchange giving rise to a taxable gain or deductible loss on the date of payment. The gain or loss is not reflected in determining the cost of the goods sold. *Joyce-Koebel Co.*, 6 B. T. A. 403, 406 (1927); 2 Mertens, Law of Federal Income Taxation, sec. 1604, p. 7; 5 *id.* at sec. 28.82, p. 287; and cases discussed, *infra*.

These principles are equally applicable here, where petitioner obtained travel services and accommodations for its patrons from Bennett's Oslo, on a running account or credit, and there is no evidence of a legal obligation to pay the debt in dollar value at the rate of exchange current at the time the debt arose. Presumably, petitioner could have paid for the services and accommodations immediately upon receipt of bills from abroad by buying kroner at the then prevailing rate. Likewise, it is evident that it could have established credit, as it did, and paid the account at a later date. Having selected the latter method, petitioner is considered to be investing or specu-

lating in foreign exchange, and "the proper method of accounting is to include purchases in the accounts at the rate of exchange prevailing at the date of purchase and to account for any profit * * * in the payment therefor as a separate transaction." *Joyce-Koebel Co.*, *supra*, at 406. In the instant case, it is clear that petitioner's purchase of kroner after the devaluation of the Norwegian currency to discharge its indebtedness to Bennett's Oslo involved a collateral transaction separate from the accommodations obtained for its patrons. See *Willard Helburn, Inc.* v. *Commissioner*, 214 F. 2d 815 (C. A. 1, 1954), affirming 20 T. C. 740, 741 (1953), where the Court of Appeals held that a taxpayer who had borrowed pounds sterling in England in an amount sufficient to pay for certain goods to be used in its business and thereafter repaid the loans in pounds sterling when the rate of exchange had gone down, had engaged in a collateral transaction in foreign currency, resulting in a "windfall" taxable as ordinary gain within the broad definition of gross income in section 22 (a) of the Internal Revenue Code of 1939.

Our most recent consideration of this issue was in *Church's English Shoes, Ltd.*, 24 T. C. 56 (1955), affirmed per curiam 229 F. 2d 957 (C. A. 2, 1956), involving a factual situation strikingly similar to the instant case. There, the taxpayer purchased shoes on credit in 1939 from its parent corporation in England, payable in pounds sterling, and in 1947 paid off its indebtedness. In 1939, the rate of exchange of the English pound sterling was $4.86, and in 1947 the rate of exchange was $4.02⅞. Holding that the gain resulting from the altered rate of exchange was ordinary income to the taxpayer, we stated (pp. 58–59) :

> The petitioner realized gain in its fiscal year ending on June 30, 1947, on a transaction in 1947 involving the purchase of foreign exchange, and the proper method of accounting is to account for any profit or loss in the payment for foreign exchange in and as a transaction which is separate from the purchase and sale of the shoes. *The Joyce-Koebel Co.*, 6 B. T. A. 403, 406; *Bernuth Lembcke Co.*, 1 B. T. A. 1051, 1054. There were two transactions, for accounting and tax purposes, one involving the purchase and sale of shoes, the other a "speculation" in foreign exchange. The shoes were sold in the fiscal years ending in 1936 and 1937. Gain or loss from such sales was to be accounted for in the years when the shoes were sold. The "speculation" in foreign exchange took place in 1947, and gain is to be accounted for in the fiscal year ending in 1947. * * *

We are of the opinion that the rationale there expressed is applicable here. Petitioner has not attempted to distinguish *Church's English Shoes. Ltd.*, from the instant case and has cited no authority to the contrary.

Although respondent's theory, on brief, is not precisely the same as that stated in the statutory notice of deficiency, it is well settled that we may affirm his determination in a proper case for reasons other

than those which he himself has assigned. *John I. Chipley*, 25 B. T. A. 1103, 1105–6 (1932); *Helvering* v. *Gregory*, 69 F. 2d 809 (C. A. 2, 1934), affirmed sub nom. *Gregory* v. *Helvering*, 293 U. S. 465; *Helvering* v. *Gowran*, 302 U. S. 238 (1937).

Petitioner contends that it did not obtain the accommodations from Bennett's Oslo on a credit basis, as determined by respondent, but that payment to the Norwegian company was made, in effect, immediately upon the receipt of the bills. In essence, it is petitioner's position that after the bills were received, the amounts thereof were converted into dollars at the then prevailing rate of exchange and credited on its books to a so-called loan account of the Norwegian firm; and as between the two corporations, this dollar credit was considered "final," Bennett's Oslo being entitled to withdraw such amount in dollars at any time. Petitioner argues further that because of the devaluation of the krone and the consequent exchange fluctuation, Bennett's Oslo was entitled to an additional credit of $25,077.61 to its "loan account" on the books of petitioner. In our opinion, the record does not support these contentions.

Respondent's determination is, of course, prima facie correct and petitioner has the burden of proof of error. We note, in passing, that despite Rule 35 (e) (3) of the Rules of Practice of this Court, petitioner has failed to "set forth complete *statements of the facts* based upon the evidence" to support its contentions. However, we have, of course, carefully analyzed the record and we have found as facts that petitioner maintained a running credit transaction with Bennett's Oslo; that although the Bennett's Oslo account was debited in the amount of $25,077.61 and two new accounts were set up, "Oslo Special" being credited in the amount of $11,269, and "Currency Fluctuation" being credited with $13,808.61, these entries were made at the direction of Bennett's Oslo. We find nothing in the record to establish any preexisting or arm's-length agreement furnishing authority for this action, and we are presented with no basis for holding that there was any legal obligation on the part of petitioner to do so. While the entries are factors to which consideration may be given, the circumstances surrounding the action are such that they can be accorded no controlling effect.

It is clear that although petitioner was controlled by Bennett's Oslo, the latter could not, by its own fiat, change the effect of the Federal income tax laws upon petitioner's transactions. A direction by Bennett's Oslo that $11,269 be credited to it in a special account cannot convert income of petitioner into an account payable to Bennett's Oslo for tax purposes however acquiescent petitioner, under the control of Bennett's Oslo, may have been. Even under the direction of Oslo, the $13,808.61 item still belonged to petitioner, and again,

Oslo was without power to alter the item for income tax purposes from income to petitioner to a capital contribution by Oslo.

Likewise, petitioner has failed to establish that the $25,077.61 was a loan from Bennett's Oslo properly credited to a loan account due the latter. There is no evidence of a loan agreement or credit of any such amount to a loan account, and the balance sheet attached to petitioner's income tax return for 1949 fails to show any such loan payable. All of the surrounding circumstances contradict this view. Even if a loan account had been set up, however, it could not have converted petitioner's gain into a debt due Bennett's Oslo.

On the basis of the foregoing discussion we hold that the $25,-077.61 was taxable as ordinary income to petitioner for the year in question.

## II.

Respondent disallowed the entire amount of $2,575.61 claimed by petitioner on its return for 1949 as an accrued business expense in connection with an amount payable to Krogh allegedly as compensation for services to, and reimbursement for expenses incurred on behalf of, petitioner. It is respondent's position that Krogh was not an "employee" of petitioner and that the purported payments were merely "gratuitous payments to maintain the good-will of the Norwegian affiliate, of which Krogh was the General Manager," and hence said amount is not properly deductible as salary or as ordinary and necessary expenses of petitioner within the intendment of section 23 (a) (1) (A) of the Internal Revenue Code of 1939.[1] We disagree with respondent's view.

It is well established that reasonable expenses for entertaining clients and customers are allowed as a deduction from gross income to the extent that they are "ordinary and necessary" in carrying on a trade or business. Sec. 23 (a) (1) (A), supra. Of course, the burden is upon petitioner to establish that the expense is both ordinary and necessary, Welch v. Helvering, 290 U. S. 111, and the issue as to whether such expenditures are ordinary and necessary raises primarily a question of fact, depending on the circumstances of each case. Cooper v. Commissioner, 184 F. 2d 514 (C. A. 3, 1950), affirming a Memorandum Opinion of this Court dated August 8, 1949.

The statutory requirements that an expense, to be deductible, must be ordinary and necessary seems to us to be met by the facts in the instant case. In the sense in which the word "necessary" has been defined as "appropriate and helpful," in our view, this expenditure was neces-

---

[1] SEC. 23. DEDUCTIONS FROM GROSS INCOME.

In computing net income there shall be allowed as deductions :

(a) EXPENSES.—

(1) TRADE OR BUSINESS EXPENSES.—

(A) In General.—All the ordinary and necessary expenses paid or incurred during the taxable year in carrying on any trade or business * * *

sary. *Welch* v. *Helvering, supra.* The term does not mean indispensable. The fact that the cocktail parties were an "added attraction" and not compulsory, in that petitioner was not obliged to make them as part of the prepaid tour arrangements, is immaterial. In our opinion, it is sufficient if there are "evident business ends to be served, and an intention to serve them appears adequately from the record." *B. Manischewitz Co.,* 10 T. C. 1139 (1948). Likewise, the concept of "ordinary" under the Code does not require that the expenditure be either habitual or normal in the sense that the taxpayer either makes or is required to make them often. *Welch* v. *Helvering, supra.*

An analysis of the entire record, including the uncontradicted testimony of Aagaard, convinces us that the expenditures in question had a definite purpose connected with the business of petitioner and were reasonably calculated to accomplish the end sought. Unquestionably, it was to petitioner's business advantage to have Krogh use his influence to arrange accommodations in foreign countries for petitioner's clients as part of the scheduled tour. As to the cocktail parties, it is clear that petitioner was prompted by the desire to show its appreciation to its clients for their patronage and to promote goodwill at a relatively low cost, a business objective which, in our opinion, comes within the ambit of the statute. True, petitioner was not obliged to arrange such entertainment, but we believe that it is the kind of expenditure that many corporations would make under similar circumstances, and we see no reason to override petitioner's judgment. See *Charles J. Dinardo,* 22 T. C. 430, 436 (1954), and cases cited therein.

Upon the evidence, we think that petitioner has demonstrated that respondent is in error in contending that the so-called bonus voted for Krogh was a "gratuitous payment" to maintain cordial business relations with Bennett's Oslo. In view of the commercial functions performed by Krogh and the nature of petitioner's business, we hold that the accrual of the amount in question was not gratuitous and was paid on the basis of an implied contract, established by the course of conduct of the parties, to reimburse Krogh for his expenses and to pay him something for his services. *Edward J. Miller,* 37 B. T. A. 830, 832 (1938).

Respondent's contention that the amount in question is nondeductible under the statute because Krogh was not an employee of petitioner during the period when the expenses were incurred or paid must be rejected. Admittedly, there is no evidence in the record of an employer-employee relationship between them. It is clear, however, that Krogh's activities were that of an independent contractor, who is no less entitled to recoup his expenses and be paid for his services than if he were an employee.

The fact that the payment to Krogh was referred to on petitioner's books as a bonus does not prevent our consideration of the true char-

acter of the payment. Book entries and labels attached to a transaction are, of course, only evidentiary and not decisive of the issue. *Commissioner* v. *Union Pac. R. Co.*, 86 F. 2d 637 (C. A. 2, 1936), affirming 32 B. T. A. 383.

Respondent, on brief, does not question that the $2,575.61 was accrued or allowable in the year in question, if allowable at all, or that it was subsequently paid to Krogh. Likewise, he does not raise any issue as to whether the amount was reasonable. The relatively small amount involved, the circumstances under which the amount was fixed, the nature of the expenses for which Krogh was reimbursed, and the services rendered by Krogh circumstantially negative any view that the amount was excessive. We think that an application of the principles of *Cohan* v. *Commissioner*, 39 F. 2d 540 (C. A. 2, 1930), is not here called for, and respondent does not suggest it. In his statutory notice of deficiency, respondent stated as his first reason for disallowance that the item was not an ordinary and necessary expense and added the further reason that Krogh was not an employee of petitioner. We have dealt with both reasons above.

Accordingly, we are of the opinion that the deduction claimed in the amount of $2,575.61 for entertainment expenses and compensation in the year 1949 should be allowed.

Relying essentially on the same contentions made with respect to the sum of $2,575.61, respondent disallowed a deduction in the amount of $207.34 accrued in 1949 as a bonus to Krogh, and paid to him in that year. The amount is part of a total item of $622.01 originally disallowed by respondent who, on brief, withdrew his objection to the allowance of a deduction of a part thereof in the amount of $414.67 which was paid to Gunnar Aagaard. We think extended discussion is unnecessary. In our opinion, the same principles and commentary expressed hereinabove apply to this item and, therefore, the amount of $207.34 must likewise be allowed.

*Decision will be entered under Rule 50.*