The TRAVELERS INSURANCE
COMPANY, Plaintiff–
Appellee,

v.

UNITED STATES, Defendant–
Appellant.

No. 01–5137.

United States Court of Appeals,
Federal Circuit.

DECIDED: Sept. 16, 2002.

Peter H. Winslow, Scribner, Hall & Thompson, LLP, of Washington, DC, argued for plaintiff-appellee.

Edward T. Perelmuter, Attorney, Tax Division, Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Eileen J. O'Connor, Assistant Attorney General; David English Carmack, and David I. Pincus, Attorneys.

Before SCHALL, DYK, and PROST, Circuit Judges.

DYK, Circuit Judge.

This federal income tax refund case has been pending in the Court of Federal Claims for over a decade. It presents two issues, each of which relates to special rules for the taxation of life insurance companies, such as the Travelers Insurance Co. ("Travelers" or "taxpayer"), the appellee in this case. The first issue is whether the policyholders' share of income should have been excluded from "taxable income" for purposes of computing the limitation on the foreign tax credit in section 904 of the Internal Revenue Code, 26 U.S.C. § 904 (1976). For life insurance companies, "taxable income" is defined in terms of taxpayer's "life insurance company taxable income" ("LICTI"). *Id.* § 802. We hold that Congress explicitly provided for the exclusion of the policyholders' share from LICTI in 26 U.S.C. §§ 804(a)(1) and 809(a)(1) (1976), and accordingly reverse the decision of the Court of Federal Claims to the contrary.

The second issue is whether, under 26 U.S.C. § 446 (1976), the Internal Revenue Service ("IRS" or "Service") properly determined that the taxpayer's method of translating foreign currency profits and losses from Canadian branch operations into United States dollars failed to "clearly reflect income." We hold that the Court of Federal Claims erred in declining to

defer to the IRS determination, and that the taxpayer has not shown that the IRS abused its discretion. Accordingly, we reverse the decision of the Court of Federal Claims to the contrary.

## BACKGROUND

Taxpayer is a stock life insurance company, which writes various forms of life and accident insurance. This case presents two issues concerning the taxpayer's income tax liability—one relating to the foreign tax credit and the other concerning the taxation of income from taxpayer's Canadian branch operations.

### I *The Foreign Tax Credit Issue*

In 1970, taxpayer entered into an agreement with an offshore drilling company under which taxpayer received a 3% interest in an Indonesian oil exploration and drilling joint venture. Every year between 1975 and 1980, taxpayer received net income from its participation in the joint venture. During those years, taxpayer paid taxes to Indonesia on the income it earned from the joint venture and claimed foreign tax credits under sections 841 and 901 of the Internal Revenue Code, 26 U.S.C. §§ 841, 901 (1976). In all relevant respects, the pertinent sections of the Tax Code were unchanged between 1975 and 1980. For ease of reference, this opinion refers to the 1976 version of the Tax Code. Many of the statutory provisions involved in this case have been revised or repealed since 1980.

### *Computation of LICTI*

In order to understand the foreign tax credit issue, it is necessary to understand the method by which the income tax of life insurance companies was computed. In-stead of using the familiar concept of "taxable income," 26 U.S.C. § 11 (1976), as the base, the Code provided that in the case of life insurance companies the base was to be "life insurance company taxable income" ("LICTI"), *id.* § 802. During the relevant taxable years, taxpayer computed its LICTI under provisions enacted in the Life Insurance Company Tax Act of 1959, Pub.L. No. 86–89, 73 Stat, 112 (1959), which were codified in former sections 801 to 820 of the Code, 26 U.S.C. §§ 801–820. Under those provisions, taxpayer initially was required to compute both its "taxable investment income" and its "gain from operations." *Id.* § 802(b). To compute its taxable investment income, the company began with its gross investment income, an item that included traditional investment income such as interest, dividends, rents, and royalties, as well as income from non-insurance business enterprises, such as oil-related income. *Id.* § 804(b). The company then subtracted from its gross investment income its investment expenses. The balance was referred to as "investment yield." *Id.* § 804(c).

The next computation involved the division of "investment yield" into a "policyholders' share" and the "company's share." *Id.* § 804(a). The first step in this computation was the development of a fraction, which was the amount of investment income needed for policyholder and other contract liability requirements (*i.e.*, the amount that must be added to reserves), divided by the total investment yield. This fraction was then multiplied by "each and every item of investment yield," *id.* § 804(a)(1), to obtain the policyholders' share of that item. The policyholders' share of each item was then excluded from income. *Id.* § 804(c)(1). The company's taxable investment income was the sum of the company's share of each item and the net capital gain. *Id.* § 804(a)(2).

"Gain from operations," in contrast to taxable investment income, consisted of all of the company's income—investment income and underwriting income. *See id.* §§ 809(b), (c) & (d); *United States v. Atlas Life Ins. Co.,* 381 U.S. 233, 235 n. 2, 85 S.Ct. 1379, 14 L.Ed.2d 358 (1965). Like the computation of taxable investment income, the investment income portion of gain from operations was only "the life insurance company's share of each and every item of investment yield[.]" 26 U.S.C. § 809(b)(1)(A). The policyholders' share of each and every item of investment yield was again excluded. *Id.* § 809(a)(1).

After computing its "taxable investment income" and "gain from operations," the company compared the two figures. If the company's gain from operations was less than its taxable investment income (because, for example, the company had underwriting losses), its tax base (LICTI) was gain from operations. *Id.* § 802(b)(1). On the other hand, if the company's gain from operations was greater than its taxable investment income, its tax base (LICTI) was taxable investment income plus one half of the excess of gain from operations over taxable investment income. *Id.* § 802(b)(2).

Although the method of computing taxable income was complex, the central fact for present purposes is that the policyholders' share of "taxable investment income" and "gain from operations" reduced taxable income (LICTI).

### The Foreign Tax Credit Provisions

For insurance companies, the foreign tax credit was authorized by 26 U.S.C. § 841 (1976), which incorporated the general foreign-tax-credit provision of 26 U.S.C. § 901 (1976). Section 841 provided that:

> The taxes imposed by foreign countries or possessions of the United States shall be allowed as a credit against the tax of a domestic insurance company subject to the tax imposed by section 802 [on LICTI] ... to the extent provided in the case of a domestic corporation in section 901 (relating to foreign tax credit).

26 U.S.C. § 841 (1976). Section 901 authorized a taxpayer to claim the credit "subject to the limitation of section 904...." *Id.* § 901(a). Section 904(a), in turn, provided:

> The total amount of the credit taken under section 901(a) shall not exceed the same proportion of the tax against which such credit is taken which the taxpayer's taxable income from sources without the United States (but not in excess of the taxpayer's entire taxable income) bears to his entire taxable income for the same taxable year.

*Id.* § 904(a). As applied to life insurance companies, section 841 provided that "life insurance company taxable income" was to be used as "taxable income" for purposes of the foreign tax credit. *Id.* § 841. The section 904 "limitation" may be expressed by the following formula, in which the right-hand side of the formula is referred to hereafter as the "section 904 fraction":

United States Income Tax Liability before Application of Foreign Tax Credit x $\dfrac{\text{Foreign Source LICTI}}{\text{Worldwide LICTI}}$

In cases involving oil-related income, section 907(b) provided that the section 904 limitation was to be applied separately for "foreign oil related income" and "other taxable income." *Id.* § 907(b)(1).[1]

### Proceedings Below

The central dispute in the Court of Fed-

---

1. There is also a separate section 907(a) limi-

tation applicable to "foreign oil and gas ex-

eral Claims [2] was whether the policyholders' share of both foreign source LICTI and worldwide LICTI, which respectively comprise the numerator and denominator of the section 904 fraction, should be treated as an exclusion or a deduction. If the policyholders' were an exclusion, both the taxpayer and government agreed that the policyholders' share should be excluded from the numerator and denominator of the section 904 fraction, and that no refund was due. On the other hand, if the policyholders' share were a deduction, the taxpayer argued that it should be ignored in calculating the numerator foreign source LICTI—because the deduction was properly attributable to United States operations under the sourcing rules of 26 C.F.R. §§ 861–863 (1977).[3] But the policyholders' share, in the taxpayer's view, was still properly deducted from the denominator to compute worldwide LICTI.[4]

On April 30, 1993, the Court of Federal Claims issued its first opinion, granting partial summary judgment to taxpayer on the foreign tax credit issue. *Travelers*

*Ins. Co. v. United States,* 28 Fed.Cl. 602 (1993). In its opinion, the Court of Federal Claims acknowledged that "[b]oth parties present coherent arguments for their positions on the nature of the policyholders' share." *Id.* at 612. The Court of Federal Claims recognized that under sections 804(a)(1) and 809(a)(1) of the Code the policyholders' share of income is "exclud[ed]" from both the numerator and denominator of the section 904 fraction. *Id.* at 607. However, relying almost entirely on section 810(b) of the Code, which relates to adjustment of life insurance company reserves, the court found that the statutory exclusion was in fact more "accurately viewed as a deduction." *Id.* at 613. This was so because the excluded amounts (the policyholders' share) reduced the amount of the reserves and hence the deduction allowed for addition to reserves. The overall effect was to increase LICTI after accounting for the deduction. The court reasoned, "[i]n reality, the policyholders' share exclusion is the required interest portion of the reserve deduction

traction income," 26 U.S.C. § 907(a) (1976), but the application of that limitation apparently has no effect here. As the Court of Federal Claims noted, "Under defendant's computation, [s]ection 907(b) imposes the greatest restriction upon Travelers' allowable foreign tax credit related to the Indonesian oil venture. Thus, [s]ection 907(b) provides the lesser foreign tax credit under [s]ection 901(a), and is the operative limitation in this case." *Travelers Ins. Co. v. United States,* 28 Fed.Cl. 602, 608 (1993).

2. When the complaint was first filed on August 19, 1988, the Court of Federal Claims was known as the United States Claims Court.

3. Specifically, taxpayer cited Treas. Reg. § 1.861–8(a), which provides in pertinent part:
  (1) Scope. Sections 861(b) and 863(a) state in general terms how to determine taxable income of a taxpayer from sources within

the United States after gross income from sources within the United States has been determined. Sections 862(b) and 863(a) state in general terms how to determine taxable income of a taxpayer from sources without the United States after gross income from sources without the United States has been determined. *This section provides specific guidance for applying the cited Code sections [which include section 904] by prescribing rules for the allocation and apportionment of expenses, losses, and other deductions (referred to collectively in this section as "deductions") of the taxpayer.* 26 C.F.R. § 1.861–8(a) (1977) (emphasis added).

4. Even if the policyholders' share were a deduction, the government argued that it should be deducted from foreign source LICTI in computing the section 904 fraction.

which is fully recouped by the corresponding decrease in the year-end reserves under [s]ection 810." *Id.* at 613. The court then concluded that this "deduction" was "properly allocated to Travelers' gross income from its domestic insurance business and not to its Indonesian oil investment activities." *Id.* at 614. Therefore, the policyholders' share was improperly excluded from foreign source LICTI, which is the numerator of the section 904 fraction, but properly deducted from worldwide income to compute worldwide LICTI. *Id.* at 615.[5]

## II  *The Foreign Currency Translation Issue*

The second issue concerns foreign currency translation. During the years 1977 through 1980, taxpayer derived income from insurance underwriting and investment operations in Canada. On its United States tax returns for those years, taxpayer calculated its taxable gain and income from its Canadian operations in Canadian dollars. Taxpayer combined those amounts with United States dollar amounts attributable to its other operations.[6] Taxpayer then made a "Canadian Exchange Adjustment" to the combined figure and reported that figure in United States dollars as part of the process of computing both its taxable investment income and its gain from operations for purposes of determining its LICTI for the relevant taxable years. In making this exchange adjustment, taxpayer used the current, end-of-the-year exchange rate.

On audit, the IRS recomputed taxpayer's LICTI by converting each line amount

attributable to Canadian operations into United States dollars, combining that amount with the United States dollar amounts attributable to taxpayer's other operations, and reporting the total amount in United States dollars. In making this adjustment, the IRS concluded that taxpayer's method failed to clearly reflect its LICTI.

There is another significant difference between the IRS and the taxpayer concerning the treatment of the historical basis of certain taxpayer assets. The IRS converted the adjusted basis of Canadian bonds, mortgages, and joint ventures from Canadian dollars to United States dollars using historical exchange rates (*i.e.*, the rates in effect at the time of the original acquisition of the asset). The government urges that this historical exchange rate was required by section 805(b)(4), which provides that "the amount attributable to—. . . (B) any other asset shall be the adjusted basis, of such asset for purposes of determining gain on sale or other disposition." 26 U.S.C. § 805(b)(4)(B) (1976).

Taxpayer paid the additional tax resulting from the Commissioner's determinations and filed a refund claim with the IRS. After the IRS denied the refund claim, taxpayer filed this refund suit claiming that the IRS had erred in substituting its own accounting method for the method employed by taxpayer.

On March 21, 1996, the Court of Federal Claims issued another opinion. In again granting partial summary judgment for the taxpayer, the Court of Federal Claims

---

5. The government correctly points out that the Court's assumptions as to the operation of the reserve provisions were not correct. In light of our disposition of this issue, we need not address the Court of Federal Claims' error in this respect.

6. The parties dispute whether taxpayer combined the amounts before or after it translated the Canadian dollars to United States dollars. This dispute is irrelevant to the outcome of this appeal.

noted that "[i]t is not the intention of this court to modify or limit the amount of latitude that has been consistently accorded the Secretary in determining what method of accounting will accurately reflect a taxpayer's income." *Travelers Ins. Co. v. United States*, 35 Fed.Cl. 138, 141 (1996). Nonetheless, the court concluded that no deference was due the IRS determination for two reasons. First, the court found that the IRS abused its discretion by imposing its own accounting method without making the necessary formal and explicit determination that the taxpayer's method did not clearly reflect income. *Id.* at 145–46. Second, the court found:

> *De novo* review of the taxpayer's method of accounting may, at first blush, seem to contradict the express language of section 446(b) because implicit in the phrase "in the opinion of the Secretary" is the concept of Secretarial discretion. Upon further examination of the placement of that language within the section, however, it is clear that section 446(b) contemplates two different levels of judicial review. *The first determination to be made by the Secretary—whether the taxpayer's regularly used method of accounting clearly reflects income—is not subject to the Secretary's opinion and therefore is to be reviewed de novo.* The second determination—what alternative method does clearly reflect income—is subject to the "opinion of the Secretary" and therefore must be accorded the significant degree of deference normally accorded to an administrative agency by a court.

*Id.* at 141 (citations omitted) (emphasis added).

The court then examined the two methods of conversion generally recognized by the IRS: the "profit and loss" and the "net worth" methods. *Id.* at 142. The "profit and loss" method involves computing net income attributable to foreign branch operations in foreign currency and then using end-of-the-tax-year exchange rates to translate the income into United States dollars. *Id.* The "net worth" method translates the balance sheet net worth, not just the income of the foreign branch. The increase in net worth is treated as taxable income. *Id.* As an example of a profit and loss method, the court identified Revenue Ruling 75–107, 1975 WL 34670, which provides in pertinent part that "[t]he balance of the net profits, expressed in [foreign] Country Y's units should be converted into United States money at the rate of exchange as of the end of the taxable year, regardless of the fact that the profits may not have been remitted to M [a domestic corporation]." *Id.;* Rev. Rul. 75–107, 1975–1 C.B. 32, 1975 WL 34670. The court then concluded that "[t]he Travelers' Method, which computes net gain or loss in Canadian currency and then converts this amount to U.S. dollars by the end-of-the-year exchange rate," *Travelers*, 35 Fed.Cl. at 142, was "essentially the same as the profit and loss method described in Revenue Ruling 75–107," 35 Fed.Cl. at 143. The court accepted this revenue ruling as evidence that Travelers' Method clearly reflected income. *Id.*

The court further concluded that the government had "not offered any conclusive evidence in support of the Service's determination that the Travelers' Method does not clearly reflect income," *id.* at 144, and more specifically, that "the government has failed to show any basis for its position that the Travelers' Method of accounting did not accurately reflect plaintiff's income for taxable years 1977 through 1980," *id.* at 145. In light of taxpayer's consistent use of this account-

ing method in addition to the IRS's previous acceptance of the method, the court held that the IRS exceeded the scope of section 446(b) by requiring taxpayer to use the Service Method. *Id.* at 145. In addressing the foreign currency translation issue, the Court of Federal Claims did not discuss section 805.

When the Court of Federal Claims entered a final judgment on June 22, 2001, the United States appealed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

## DISCUSSION

The issues in this case are issues of law, which we review without deference to the Court of Federal Claims. *Conti v. United States*, 291 F.3d 1334, 1338 (Fed.Cir.2002).

### I. *The Foreign Tax Credit Issue*

The clear language of the Code governs the foreign tax credit issue. Those provisions excluded the policyholders' share from LICTI.

As noted above, the "section 904 fraction" for purposes of the foreign tax credit is calculated in terms of taxpayer's "life insurance company taxable income" ("LICTI"), which is, in turn, calculated from the company's "taxable investment income" and "gain from operations." 26 U.S.C. §§ 841, 802(b) (1976). Section 804(a)(1) provides in pertinent part that "[t]he policyholders' share of each and every item of investment yield (including tax-exempt interest and dividends received) of any life insurance company *shall not be included*

in taxable investment income." *Id.* § 804(a)(1) (emphasis added). Section 809(a)(1) similarly provides that "[t]he share of each and every item of investment yield (including tax-exempt interest and dividends received) of any life insurance company set aside for policyholders *shall not be included* in gain or loss from operations." *Id.* § 809(a)(1) (emphasis added). Thus, both provisions require that the policyholders' share be excluded from any computation of LICTI. Indeed, the Supreme Court recognized that the policyholders' share should be treated as an exclusion in *United States v. Atlas Life Insurance Co.*, 381 U.S. 233, 85 S.Ct. 1379, 14 L.Ed.2d 358 (1965), stating: "Each item of investment income, including tax-exempt interest, is divided into a policyholders' share and a company's share. *The policyholders' share is added to the reserve, is excluded for tax purposes from the gross income of the company and is not taxed to either the company or the policyholders.*" *Id.* at 239, 85 S.Ct. 1379 (emphasis added).

Taxpayer's primary argument, adopted by the Court of Federal Claims, is that any exclusion is only a temporary exclusion because the amount of the exclusion is later included in income by an adjustment to the reserves of the company. Thus, according to the taxpayer, this "exclusion" is in reality a "deduction" and that "deduction ... is fully recouped by the corresponding decrease in the year-end reserves under [s]ection 810." *Travelers*, 28 Fed.Cl. at 613.[7]

■ The taxpayer misunderstands the function of section 810. "Life insurance

---

7. An exclusion is defined as "[a]n item of income excluded from gross income." *Black's Law Dictionary* 585 (7th ed.1999). On the other hand, a deduction is defined as

"[a]n amount subtracted from gross income when calculating adjusted gross income, or from adjusted gross income when calculating taxable income." *Id.* at 422.

reserves may be defined simply as that fund which, together with future premiums and interest, will be sufficient to pay future claims." *Atlas*, 381 U.S. at 236 n. 3, 85 S.Ct. 1379; *accord* 26 U.S.C. § 801(b)(1) (1976). Section 810 provides the method of computing its decreases or increases in annual reserves. A net decrease produces a corresponding increase in income, and a net increase produces a reserve deduction (and a decrease in income). 26 U.S.C. §§ 810(a), (b), 809(d)(2) (1976). Sections 810(a) and (b) provide parenthetically that prior to computation of any net decrease or increase in reserves, the items taken into account in calculating the adjustment in reserves [8] must first be "reduced by the amount of investment yield not included in gain or loss from operations for the taxable year by reason of section 809(a)(1)." *Id.* § 810(a) and (b) (parentheses omitted). In other words, the policyholders' share is not taken into account in computing the increase or decrease in reserves. While the net effect of section 810 may be that the reserve deduction is decreased (and the taxpayer's income increased) in some circumstances by the policyholders' share, nothing in section 810 alters the provisions of sections 804 or 809 or converts an exclusion into a deduction.

█ As the Supreme Court has repeatedly recognized, "[c]ourts are not authorized to rewrite a statute because they might deem its effects susceptible of improvement." *Badaracco v. Comm'r*, 464 U.S. 386, 398, 104 S.Ct. 756, 78 L.Ed.2d 549 (1984); *see also TVA v. Hill*, 437 U.S. 153, 194–95, 98 S.Ct. 2279, 57 L.Ed.2d 117 (1978). Here the taxpayer effectively requests that this court rewrite the Tax Code and treat a clearly labeled statutory exclusion as a deduction. Although the parties urge us to consider legislative history [9] and policy considerations to determine the appropriate treatment of the policyholders' share, that is quite unnecessary. The Code is clear on its face, and we are not charged with rewriting it to convert an exclusion into a deduction based on the theory proposed by the taxpayer and adopted by the Court of Federal Claims. *See Marsh Corp., Inc. v. United States*, No. 02–5002, slip op. at 20 (Fed.Cir. Sept. 6, 2002); *Phila. & Reading Corp. v. United States*, 944 F.2d 1063, 1074 (3d Cir. 1991).[10]

Taxpayer relies on our decision in *American Mutual Life Insurance Co. v. United*

---

**8.** These items include life insurance reserves, unearned premiums and unpaid losses included in total reserves, amounts necessary to satisfy obligations under insurance or annuity contracts, premiums received in advance, liabilities for premium deposit funds, and special contingency reserves. 26 U.S.C. § 810(c) (1976).

**9.** If we were to consider the legislative history, we would conclude that it favors the government, not the taxpayer. All of the pertinent legislative history indicates that the policyholders' share was to be treated as an exclusion, not a deduction. *See, e.g.*, S.Rep. No. 291, at 22 (1959), *reprinted in* 1959 U.S.C.C.A.N. 1575, 1596 ("Under your committee's amendments the required interest is omitted here because it is represented by the exclusion of that portion of the investment yield set aside for policyholders."). Indeed, the Court of Federal Claims noted that "the legislative history indicates that Congress specifically designated the policyholders' share as an exclusion after initially labeling it as a deduction." *Travelers*, 28 Fed. Cl. at 612.

**10.** There is no inconsistency in this respect with the Supreme Court's decision in *Atlas*, which characterized the tax consequences of the Code for purposes of a constitutional issue, not for purposes of statutory construction. *Atlas*, 381 U.S. at 250–51, 85 S.Ct. 1379.

*States,* 267 F.3d 1344 (Fed.Cir.2001), to urge that the policyholders' share is more analogous to a deduction than an exclusion. In *American Mutual,* the taxpayer argued that it received only a partial tax benefit from the deductions it took for increases in reserves. *American Mutual,* 267 F.3d at 1349. Consequently, the taxpayer urged that the corresponding reserve releases (*i.e.,* reductions in reserves) in later tax years should not have been taxed as income, relying on the tax benefit rule codified at section 111.[11] *Id.* at 1349–50. The tax benefit rule ensures that "if a taxpayer takes a deduction attributable to a specific event, and the amount is recovered in a subsequent year, income tax consequences of the later event depend in some degree on the prior related tax treatment." *Id.* at 1346 (citation omitted). Affirming the Court of Federal Claims, we held that "because American Mutual received a benefit from the reserve deductions taken, it cannot resort to the tax benefit rule to exclude from income amounts corresponding to release of those reserves." *Id.* at 1354. Nothing in *American Mutual* remotely suggests that the policyholders' share is a deduction from reserves rather than an exclusion.[12]

Therefore, we conclude that the Code requires that the policyholders' share be treated as an exclusion from both the numerator and the denominator of the section 904 fraction, and we reverse the Court of Federal Claims' decision to the contrary.

---

**11.** The tax benefit rule codified in section 111(a) provides: "Gross income does not include income attributable to the recovery during the taxable year of any amount deducted in any prior taxable year to the extent such amount did not reduce the amount of tax imposed by this chapter." 26 U.S.C. § 111(a) (2000).

**12.** Taxpayer also urges that the government has taken a different position on appeal to

## II  *The Foreign Currency Translation Issue*

### A

We turn now to the second issue relating to foreign currency translation. Taxpayer argues that neither the Code nor the regulations required that a particular accounting method be used to translate the foreign currency into United States dollars. Taxpayer urges that its accounting method, which reported its Canadian branch taxable investment income and gain from operations in Canadian dollars and then applied year-end exchange rates to convert those figures into United States dollars, clearly reflected income because it was in essence the profit and loss method identified in Revenue Ruling 75–107. Revenue Ruling 75–107 provides in pertinent part that "[t]he balance of the net profits, expressed in [foreign] Country Y's units should be converted into United States money at the rate of exchange as of the end of the taxable year, regardless of the fact that the profits may not have been remitted to M [a domestic corporation]." Rev. Rul. 75–107, 1975–1 C.B. 32, 1975 WL 34670. The taxpayer acknowledges that its accounting method differs from Revenue Ruling 75–107 in that it is applied in two separate phases, which yield two exchange rate conversions, rather than just one phase as the revenue ruling suggests. However, the taxpayer argues that this difference is an immaterial variation.

this court from the previous position that it took in its brief to this court filed in *American Mutual.* Even if its two positions were inconsistent, such an inconsistency is irrelevant, because our task is to determine the correct interpretation of the statute. In any event, the government did not say anything inconsistent in its brief in that case with its current position in this court.

The government urges that taxpayer's accounting method does not clearly reflect income and that the IRS has broad discretion to set aside a taxpayer's accounting method if it does not clearly reflect income. The government contends that the profit and loss method of accounting identified in Revenue Ruling 75–107 differs markedly from taxpayer's accounting method. Specifically, the government urges that taxpayer combined its taxable gain and income from its Canadian operations with the taxable gain and income from other United States operations without first translating the Canadian dollars to United States dollars. The government then states that taxpayer applied an unspecified "Canadian Exchange Adjustment" to the combined figure using the current, year-end exchange rates. The government argues that taxpayer's method fails to clearly reflect income and contends that the Court of Federal Claims erred by substituting its judgment for that of the IRS when it concluded that taxpayer's accounting method clearly reflected income.

A second foreign currency translation issue concerns the calculation of the basis of certain assets. The government urges that section 805(b)(4) dictates that the taxpayer should have used historical rather than current year-end exchange rates for the foreign currency translation of certain assets. The taxpayer urges that section 805(b)(4) does not govern this case because "[t]he purpose of section 805(b)(4) is to quantify assets to determine the *current* earnings rate," App. Br. at 59, and it does not address whether historical or current exchange rates should be used in calculating the basis of those assets. As noted above, the Court of Federal Claims failed to address this issue.

## B

Initially, we note that the decision of the Court of Federal Claims on the foreign currency translation issue rests on two quite mistaken premises concerning the authority of the IRS acting pursuant to section 446 of the Code. Section 446 provides in pertinent part:

(a) General Rule

Taxable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books.

(b) Exceptions

If no method of accounting has been regularly used by the taxpayer, or *if the method used does not clearly reflect income, the computation of taxable income shall be made under such method as, in the opinion of the Secretary, does clearly reflect income.*

26 U.S.C. § 446 (1976) (emphasis added).

■ First, the Court of Federal Claims erred when it concluded that no deference was due the IRS determination because the IRS had not made an explicit determination that the Service Method clearly reflected income. *Travelers*, 35 Fed.Cl. at 145. There is no requirement in section 446 that the IRS make explicit findings identifying section 446 as the source of its authority. Such a determination is implicit when the IRS substitutes its method for the method of the taxpayer.

■ Second, the Court of Federal Claims, following its own decision in *Mulholland v. United States*, 28 Fed.Cl. 320, 335 (1993), erred in applying a *de novo* standard of review as to whether the taxpayer's accounting method clearly reflected income within the meaning of section 446(b). *See Travelers*, 35 Fed.Cl. at 141. We find no support for the Court of Federal Claims' position in the language of

the statute. Under section 446, the Commissioner has broad discretion to set aside a taxpayer's accounting method if he believes that it does not clearly reflect income. Over 70 years ago, in *Lucas v. American Code Co.*, 280 U.S. 445, 50 S.Ct. 202, 74 L.Ed. 538 (1930), the Supreme Court emphasized the broad discretion that the Service should be given to interpret the Code, including provisions such as the precursor to section 446:

> And the direction that net income be computed according to the method of accounting regularly employed by the taxpayer is expressly limited to cases where the Commissioner believes that the accounts clearly reflect the net income. Much latitude for discretion is thus given to the administrative board charged with the duty of enforcing the Act. Its interpretation of the statute and the practice adopted by it should not be interfered with unless clearly unlawful.

*Id.* at 449, 50 S.Ct. 202. *See also Thor Power Tool Co. v. Comm'r*, 439 U.S. 522, 532, 99 S.Ct. 773, 58 L.Ed.2d 785 (1979) (indicating that section 446, *inter alia*, "vest[s] the Commissioner with wide discretion in determining whether a particular method of inventory accounting should be disallowed as not clearly reflective of income.").

So too, our prior decisions reject a *de novo* standard of review. *See LaCrosse Footwear, Inc. v. United States*, 191 F.3d 1372, 1379 (Fed.Cir.1999) (finding that the Commissioner did not abuse his discretion when he concluded that taxpayer's accounting method did not clearly reflect income); *Morgan Guar. Trust Co. of N.Y. v. United States*, 218 Ct.Cl. 57, 585 F.2d 988, 997 (Ct.Cl.1978) (finding that the Commissioner abused his discretion when he rejected taxpayer's accounting method).

Accordingly, the Court of Federal Claims must accord substantial deference to the IRS determination that the taxpayer's method does not clearly reflect income.

## C

■ Applying the correct standard, we conclude that the IRS determination must be sustained. The taxpayer here made no showing that the IRS abused its discretion in determining (1) that the taxpayer's method did not clearly reflect income and (2) substituting its own methodology. The IRS properly required the use of the established profit and loss method. The fact that the taxpayer's methodology may have been "conceptually similar" to or "essentially the same as" the IRS-approved method is irrelevant. Contrary to the Court of Federal Claims' decision, it is also of no moment that the IRS did not challenge the taxpayer's methodology in each year. The IRS is not bound by its earlier position. *See Dickman v. Comm'r*, 465 U.S. 330, 343, 104 S.Ct. 1086, 79 L.Ed.2d 343 (1984); *Caldwell v. Comm'r*, 202 F.2d 112, 115 (2d Cir.1953). We have considered and reject the taxpayer's other challenges to the IRS determination. However, one aspect of the IRS determination requires further comment.

The government contends that section 805 compels that the basis of bonds, mortgages, and joint venture assets be computed at historical rather than current, year-end exchange rates. We are unable to find any such requirement in section 805.

■ Section 805 provides in pertinent part:

> (b) Adjusted reserves rate and earnings rates.
>
> . . . .

#### (4) Assets

For purposes of this part, the term "assets" means all assets of the company (including nonadmitted assets), other than real and personal property (excluding money) used by it in carrying on an insurance trade or business. For purposes of this paragraph, the amount attributable to—

(A) real property and stock shall be the fair market value thereof, and

(B) *any other asset shall be the adjusted basis, of such asset for purposes of determining gain on sale or other disposition.*

26 U.S.C. § 805 (1976) (emphasis added). Section 805(b)(4) describes how to quantify assets to determine the adjusted reserves rates and earnings rates for any taxable year. Nothing in section 805 specifies whether, for income tax purposes, the basis of assets for computing capital gain or loss should be computed using historical or current, year-end exchange rates. Section 805 does not specifically define "adjusted basis." That section evidently contemplates use of standard basis provisions. Section 1011(a), a generally applicable section of the Code, simply provides that the "adjusted basis" shall be determined under section 1012. *Id.* § 1011(a). Section 1012(a), in turn, provides that "[t]he basis of property shall be the cost of such property...." *Id.* § 1012. Thus, section 805

does not specify the use of a particular basis for foreign branch assets of life insurance companies purchased with foreign currency. We hold that section 805 does not require the result for which the government argues—namely, determining the basis of bonds, mortgages, and joint venture assets for income tax purposes by reference to historical exchange rates.[13] Nonetheless, we conclude that the IRS could properly, as an exercise of discretion, require the use of historical exchange rates in order to capture the gain attributable to the purchase of capital assets in depreciated foreign currency, which have since increased in value.[14]

### CONCLUSION

For the above reasons, we reverse the decision of the Court of Federal Claims on both the foreign tax credit and the foreign currency translation issues.

### COSTS

No costs.

---

**13.** We also note that the foreign currency cases on which the government relies do not involve capital assets held by foreign branch operations. *See, e.g., KVP Sutherland Paper Co. v. United States,* 170 Ct.Cl. 215, 344 F.2d 377 (Ct.Cl.1965); *Bennett's Travel Bureau, Inc. v. Comm'r,* 29 T.C. 350, 1957 WL 981 (1957); *The Joyce–Koebel Co. v. Comm'r of Internal Revenue,* 6 B.T.A. 403, 1927 WL 918 (1927); *Appeal of Bernuth Lembcke Co.,* 1 B.T.A. 1051, 1925 WL 896 (1925).

**14.** We note that these foreign currency issues are now governed by legislation enacted in the Tax Reform Act of 1986, Pub.L. No. 99–514, 100 Stat.2085 (1986). The Conference Committee Report on that legislation noted that under the law existing before the new statute for purposes of the net worth method, historical exchange rates were to be used. H.R. Conf. Rep. No. 99–841, at II–674 (1986), *reprinted in* 1986 U.S.C.C.A.N. 4075, 4762.